## S95P0209. McMICHEN v. THE STATE.
### (458 SE2d 833)

SEARS, Justice.

Kim Anthony McMichen was convicted on two counts of malice murder, of his estranged wife Luan McMichen and her boyfriend, Jeff Robinson. The jury recommended the death penalty for each of the two counts of murder, finding that each had been committed during the course of the other murder[1] and that each was outrageously or wantonly vile, horrible or inhuman in that it involved depravity of mind.[2] The jury also found that the murder of Luan McMichen was outrageously or wantonly vile, horrible or inhuman in that it involved torture.[3] The trial court imposed two death sentences for the murder convictions.[4] McMichen contends that the death sentences must be reversed, challenging each of the statutory aggravating circumstances. We affirm, finding that each death sentence is supported by an aggravating circumstance, in that the murder of Luan McMichen involved depravity of mind and the murder of Jeff Robinson was committed during the course of the murder of Luan McMichen. We find no reversible error in the various other enumerations of error.

The evidence presented at trial authorized the jury to find the following:

Kim and Luan McMichen were married in 1983 and had one child, Katie, in 1985. Throughout most of their turbulent marriage, the couple lived with McMichen's parents in a rural home in Douglas County. Luan worked steadily, primarily as an employee of her father-in-law in the basement of the McMichens' home. Kim McMichen worked sporadically, chronically abused alcohol and suf-

---

[1] See OCGA § 17-10-30 (b) (2).
[2] See OCGA § 17-10-30 (b) (7).
[3] Id.
[4] The indictment alleged that the crimes occurred on November 16, 1990. McMichen was indicted on December 10, 1990. On April 12, 1993, after a jury had found McMichen competent to stand trial, the state filed its notice of intent to seek the death penalty. Voir dire began on May 3, 1993. McMichen's trial began May 24, 1993, and on June 7, 1993 the jury returned its verdict finding him guilty of the crimes charged. The jury's recommendation of death sentences was returned on June 9, 1993, and the trial court imposed sentence on July 1, 1993. McMichen's motion for new trial, filed on July 1, 1993 and amended on June 27, 1994, was denied on August 25, 1994. His appeal was docketed in this Court on October 26, 1994. The case was orally argued on February 13, 1995.

fered recurring bouts of depression.

In or about January 1990, Luan resolved to end her marriage. She and McMichen were living in a trailer in Bremen, Georgia. Luan secured a job in Atlanta independent of her parents-in-law and asked McMichen to move out. McMichen returned to his parents' home, taking Katie with him.

Soon after the couple separated, McMichen began harassing Luan. Luan told her mother and co-workers that on one occasion, McMichen entered the trailer in Bremen, destroyed Luan's clothes, and raped her. Luan said that on another occasion, McMichen threw her purse and car keys on top of the trailer when she was attempting to leave for work, causing her to have to climb on top of the trailer to retrieve them. Luan eventually abandoned the trailer and attempted to conceal her whereabouts from McMichen. She began living with Jeff Robinson, a renewed acquaintance whom she had known in high school. Luan confided to her co-workers that she believed Robinson could offer her protection from McMichen.

Unable to find Luan at the trailer in Bremen, McMichen began harassing Luan at work. McMichen insisted that Luan return to him and refused to allow her to see Katie alone unless she complied with his demands. Co-workers testified that McMichen's harassment caused Luan severe distress, and that Luan frequently cried and spoke of her desire to have custody of Katie, of her fear that McMichen would kill Luan and of her fear that his harassment would cause her to lose her job.

In February or March 1990, Luan learned that she was pregnant. Although Luan was intimate with Robinson at the time of conception, the paternity of the child was and remains questionable because of the alleged rape. In March, Luan told McMichen that she was pregnant. McMichen began insisting that the unborn child was his.

In October 1990, shortly before the baby was due, McMichen happened upon a woman he had dated in high school. He confided to the woman about his marital problems and told her that if the new baby turned out not to be his he would kill Luan and her boyfriend.

When Luan left her employment for maternity leave, just before the birth of the new baby, McMichen began harassing Luan's co-workers by telephone, insisting that they tell him Luan's whereabouts. On instructions from Luan, her co-workers refused to disclose any information to McMichen.

Nevertheless, after the baby's birth, McMichen learned that Luan and Robinson were living in a trailer park in Douglas County. Although McMichen would not permit Luan to visit Katie alone, he did agree to bring Katie to Luan's trailer for prearranged visits. McMichen also began making frequent visits to the trailer unaccompanied by Katie. During these visits, McMichen would stay outdoors,

drinking beer and challenging Robinson to fight. McMichen was usually armed. On at least one occasion, a neighbor became concerned enough by the shouting to persuade her husband to go to the truck and coax a weapon away from McMichen. Neighbors testified that in each of these disputes, it was McMichen who threatened and challenged Robinson, and that the victims implored McMichen simply to leave.

On the afternoon of November 16, 1990, McMichen loaded his truck with a .38 revolver, a .44 revolver, a bolt action rifle and his beer cooler, telling five-year-old Katie that they were going deer hunting. He drove to Luan and Robinson's trailer for a scheduled visit and waited in the truck while Katie played with her mother inside. When Robinson returned home, McMichen provoked an argument with him. The argument continued for a prolonged period, during which both men drank alcohol. At some point, the two men went to the liquor store. While they were away, Luan took McMichen's guns from his truck and placed them on a table inside the trailer. Upon returning, McMichen retrieved the guns and went back outdoors where he continued to harass the victims. A neighbor overheard McMichen yell, "I've got something for the both of you." Thereafter, McMichen fired two shots with the .38 revolver. The first shot entered Robinson's right ear from close range, killing him instantly. The second shot struck Luan in the heart, killing her within minutes. The bodies lay on the pavement near McMichen's truck, bleeding profusely, with blood pouring down an incline into the street.

After killing the victims, McMichen retrieved a beer from his truck. He then entered the trailer, took Katie by the hand, walked her past both bodies through the victims' blood, and left her in the truck in view of the murder scene. He then walked to a neighbor's trailer to call his mother, telling her, "I've done it. Come get Katie." While at the neighbor's home, McMichen sat in a lounge chair, drank his beer and smoked a cigarette. When Katie was found a short time later, she was still in the truck with blood on her shoes, screaming for someone to call an ambulance for her mother.

When the police arrived at the scene, McMichen was mumbling, "I didn't mean to do it," and "it all happened so quick." He told one officer, "I fucked up, didn't I?"

For more than a year after killing the victims, McMichen claimed that he suffered almost total memory loss. He denied recognizing his parents, said he did not recall having a child and claimed not to know what it meant to kill someone. McMichen's own expert witness determined that McMichen was malingering, and a jury found McMichen competent to stand trial. At trial, McMichen testified in great detail, claiming that he killed Robinson in self-defense and Luan by accident.

1. Construing the evidence in the light most favorable to the verdict, a rational trier of fact could have found McMichen guilty of the crimes charged beyond a reasonable doubt.[5]

2. McMichen contends that both death sentences must be reversed, because none of the requisite statutory aggravating circumstances can withstand scrutiny. First, he argues that the facts are insufficient to establish under OCGA § 17-10-30 (b) (7) that either murder involved depravity of mind or that the murder of Luan involved torture. Therefore, he argues, all that remains are the mutually supporting aggravating circumstances under OCGA § 17-10-30 (b) (2), that each murder was committed during the course of the other. Only one of the § 17-10-30 (b) (2) aggravators can be upheld, and McMichen argues that this court has no basis for choosing which death sentence to uphold. We disagree. Because the evidence supports the jury's finding of at least two statutory aggravating circumstances — double murder and depravity — we affirm both sentences.

First, we analyze the sufficiency of the evidence to support the finding of depravity of mind. In so doing, we are squarely confronted with the novel question whether McMichen's conduct toward Katie in the course of killing the victims, knowing but not intending that his actions would cause Katie severe mental distress, is alone sufficient to prove depravity. The prosecution urged the jury to find depravity as to each murder based upon McMichen's walking five-year-old Katie through her mother's blood and leaving the child screaming in the truck overlooking the murder scene while McMichen drank beer at the neighbor's house. We hold that this evidence is sufficient.

Although we have never addressed the precise question with which we are now confronted, our holding today is the logical extension of our opinions in *Strickland v. State*, 247 Ga. 219 (275 SE2d 29) (1981) and *Hall v. State*, 261 Ga. 778 (415 SE2d 158) (1991). The defendant in *Strickland*, irate that his former girl friend Carroll refused to reestablish a relationship with him, went to her home and fatally shot her father, brother and sister in her presence.[6] The defendant also shot Carroll repeatedly in a successful effort to leave her alive but disfigured.[7] The jury found that the death sentences for the murders of the father and brother were supported by the aggravating circumstances that they were each committed in the course of another murder.[8] The jury found that the death sentence for the murder of the sister was supported by OCGA § 17-10-30 (b) (7), in that it in-

---

[5] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[6] *Strickland*, 247 Ga. at 228.

[7] Id. at 232.

[8] Id. at 230; OCGA § 17-10-30 (b) (2).

volved depravity of mind.[9] In upholding the (b) (7) aggravating circumstance, we noted that the sister's fatal wounds were intended to be gruesome for the purpose of hurting Carroll, and that they and the wounds to Carroll herself were inflicted as part of a plan that Carroll would live "to experience all the physical and mental suffering [the defendant] inflicted upon her."[10] We then held:

> Depravity may be proven in many ways, including, as in the present case, by the killing of a victim in a vile, horrible or inhuman manner so as to inflict mental distress upon her close relative. . . . We deem it appropriate to consider the nonfatal wounds inflicted upon [Carroll] as well as the fatal wounds inflicted on [her sister] because they are all aspects of the same depraved plan to inflict mental distress on [Carroll].[11]

Thus, *Strickland* supports a finding of depravity, in limited circumstances, based upon infliction of mental distress on someone other than the murder victim. However, in *Strickland* the defendant's actions were specifically intended to harm a third party. There was no evidence at trial to suggest that McMichen killed either victim "so as to inflict mental distress" upon Katie.

Our holding in *Hall v. State*, 261 Ga. 778 (415 SE2d 158) (1991), however, was not dependent upon a finding of intent to harm a third party. In *Hall*, we held that in sentencing a father for the murder of his son, the jury could consider in aggravation the father's cruelty to his young daughters who merely witnessed the murder. In addition to being sentenced to death for the murder, Hall was convicted of two counts of cruelty to children.[12] We upheld the latter convictions, finding that the jury was entitled to conclude that the defendant maliciously caused his daughters mental pain when he shot their brother in front of them with an awareness of a strong likelihood that such harm would result.[13] Citing OCGA § 17-10-2, we further held that it was proper for the jury to consider the offenses of cruelty to children in aggravation when sentencing Hall for murdering his son.[14] We did not, however, address the issue whether cruelty to the onlooking children could constitute depravity as a statutory aggravating circumstance. In analyzing the sufficiency of the evidence of depravity, we

[9] *Strickland*, 247 Ga. at 230.
[10] Id. at 232.
[11] Id.
[12] Id. at 778.
[13] Id. at 782.
[14] Id. at 784.

considered only the defendant's actions towards the victim.[15] The concurring opinion in *Hall* noted, however, that "a jury most assuredly might find that the murder by Hall of his minor son in the presence of his minor daughters . . . demonstrated 'depravity of mind.' "[16]

Building logically upon our holdings in *Strickland* and *Hall*, we find that McMichen's gross disregard for the virtually certain and profound impact of his actions on his five-year-old child amply supports the jury's finding that the murder of Luan McMichen was outrageously and wantonly vile, horrible and inhuman in that it involved depravity of mind.

We turn next to a consideration of the statutory aggravating circumstances under OCGA § 17-10-30 (b) (2). McMichen is correct that the doctrine of "mutually supporting aggravating circumstances" precludes simultaneous use of the murder of one victim to support the death penalty for murder of the second victim and use of the murder of the second to support the death penalty for the murder of the first.[17] However, this court has consistently found it appropriate, when faced with mutually supporting aggravating circumstances, to select one of the two as a basis for affirming a death sentence.[18] In keeping with that practice, we eliminate the OCGA § 17-10-30 (b) (2) aggravating circumstance supporting the sentence of death for the murder of Luan McMichen and hold that McMichen's death sentence for the murder of Jeff Robinson is supported by OCGA § 17-10-30 (b) (2) in that the murder was committed while McMichen was in the course of murdering Luan.

Because we find that each death sentence is supported by at least one statutory aggravating circumstance, we need not and do not reach the issue whether the evidence of McMichen's harassment of Luan throughout the ten or more months preceding her death was sufficient to support a finding of psychological torture under OCGA § 17-10-30 (b) (7).

3. The trial court did not err in denying McMichen's ex parte motions for funds with which to hire a forensic pathologist and a ballistics expert. McMichen contends that he demonstrated a critical need for independent expert opinions and assistance in cross-examination of the state's experts regarding the bullet trajectories and wounds, to enable McMichen to demonstrate that the physical evi-

---

[15] Id. at 783.

[16] Id. at 785 (Weltner, J., concurring specially).

[17] *Wilson v. State*, 250 Ga. 630, 638 (300 SE2d 640) (1983).

[18] See, e.g., *Burden v. State*, 250 Ga. 313, 316 (297 SE2d 242) (1982); *Godfrey v. State*, 248 Ga. 616, 625 (284 SE2d 422) (1981); *Waters v. State*, 248 Ga. 355, 368 (283 SE2d 238) (1981).

dence is consistent with his claim of self-defense. McMichen testified at trial that he shot the victims while defending himself against an attack by Robinson. McMichen claims that Robinson pinned him against a truck, bent over him face to face so that McMichen was bent backwards, and was choking McMichen to unconsciousness when McMichen fired the two fatal shots. Yet the evidence adduced at trial indicated that McMichen took the gun from his right pocket with his right hand and shot Robinson in the right ear. The evidence further indicated that the bullet traveled horizontally through Robinson's brain. There is no dispute that Luan stood a few feet away when the shots were fired. Yet the evidence showed that the bullet which struck Luan in the heart traveled at an angle downward before exiting through her back. Therefore, McMichen's defense is clearly inconsistent with the physical evidence, and McMichen has failed to make the requisite showing that the issues to be addressed by the requested experts are subject to varying expert opinion.[19]

The trial court denied additional requests by McMichen for funds with which to hire experts, including a jury selection specialist and a mitigation specialist. After thoroughly reviewing the ex parte motions and transcripts of hearings thereon, we find no error in the trial court's analysis of each request.

4. (a) The trial court did not err in admitting evidence of prior difficulties between McMichen and the victims. After proper notice, the trial court conducted a hearing as required by Uniform Superior Court Rule 31.3 eliciting the prospective testimony of each witness. The testimony of the victims' neighbors and Luan's co-workers recounting their observations of McMichen's harassment of the victims was admissible to prove McMichen's bent of mind toward the victims.[20] The testimony of Luan's mother, co-workers and friends recounting Luan's description of the harassment she endured throughout the year, including the rape in January which may have resulted in the conception of her child, bore particularized guarantees of trustworthiness and was properly admitted under the necessity exception to the hearsay rule.[21] Although the alleged rape was somewhat removed in time from the murders, the evidence indicates that the harassment continued virtually unabated from the time of the rape to the day the victims died.[22] Furthermore, Luan told numerous people about the rape and other incidents of harassment and never disavowed her statements.[23]

---

[19] See *Roseboro v. State*, 258 Ga. 39, 40 (365 SE2d 115) (1988).
[20] See *Brantley v. State*, 262 Ga. 786, 789 (427 SE2d 758) (1993).
[21] See *Roper v. State*, 263 Ga. 201, 202 (429 SE2d 668) (1993).
[22] See *Maxwell v. State*, 262 Ga. 73, 75 (414 SE2d 470) (1992).
[23] See *McKissick v. State*, 263 Ga. 188, 189 (429 SE2d 655) (1993).

(b) There is no merit to McMichen's contention that the trial court erred in admitting evidence of his attempted drug use with a minor child and of his DUI charge. McMichen opened the door to such evidence when he testified on direct examination about his drug and alcohol use. There was no objection at trial to the introduction of DUI evidence, and there was no statement or implication in the cross-examination that the person to whom McMichen offered drugs was a minor.

5. The trial court did not err in admitting Robinson's medical records regarding his surgery in January 1990 for a chronic degenerative back problem. The records were relevant to rebut McMichen's defense that he killed the victims in self-defense after Robinson attacked him.

6. There is no merit to McMichen's contention that he was prevented from or limited in admitting evidence regarding Robinson's propensity for violence toward McMichen and others. The record reflects that, to the contrary, each such item of evidence was admitted.

7. McMichen complains that he was erroneously prevented from mentioning or introducing evidence of cocaine metabolites discovered in Robinson's blood and urine, and of a syringe containing cocaine which was found in Robinson's sock, until McMichen made a prima facie showing that self-defense was an issue. The record reflects, however, that all such evidence was admitted at trial. McMichen has made no showing of prejudice stemming from the timing of the introduction of any of the evidence.

8. McMichen contends that the trial court erred in excluding evidence of Luan's alleged extramarital affairs, his correspondence with Luan's step-mother, and a photograph of McMichen with Katie. He also contends that the trial court erroneously limited the testimony of his divorce attorney and her employees. McMichen contends that the bulk of this evidence was offered to rebut testimony regarding prior difficulties between McMichen and Luan which tended to portray Luan as victimized. Contrary to McMichen's assertions, the record reflects that most of the offered evidence was admitted. The remainder was irrelevant.

9. (a) McMichen contends that the trial court erroneously threatened to compel McMichen's psychological expert to produce his file on McMichen's treatment if he testified. McMichen argues that much of the material contained in the expert's file was not only privileged but irrelevant, because in addition to evaluating McMichen after the murders, the expert had previously seen McMichen and Luan for marriage counseling and had counseled McMichen individually. McMichen contends that the court's threat forced him to forgo having the expert testify, thus compromising McMichen's defense against claims that Luan left him because she was victimized.

The court did not err. The parties and the court agreed that the expert's testimony would not effect a waiver as to Luan's counseling. McMichen had already waived the privilege with respect to that portion of the expert's files pertaining to his own evaluation and counseling by having the expert testify in competency proceedings.

(b) At the competency trial, the expert opined that McMichen, who at that time claimed almost total memory loss, was malingering. Therefore, when the defense failed to offer the expert's testimony at trial after alluding to it in the opening statement, the state did not act improperly in speculating to the jury that the expert's testimony would not have been favorable to McMichen.

10. McMichen contends that the court erroneously compelled McMichen to identify his expert toxicologist and forensic psychiatrist and to provide any written reports prepared by the expert before McMichen had determined whether to use the expert at trial. Although McMichen did disclose the expert's identity during trial, he did not call the expert to testify, and he in fact provided no reports to the state in violation of the rule set forth in *Rower v. State*, 264 Ga. 323, 325 (443 SE2d 839) (1994). Therefore, McMichen has failed to show any harm, and reversal is not required.[24]

11. (a) The trial court did not err in permitting the state to cross-examine McMichen regarding prior inconsistent statements which he made while in custody. Introduction of evidence that McMichen made affirmative statements claiming near total loss of memory did not constitute a comment on McMichen's right to remain silent. Nor was it improper for the prosecutor to question McMichen regarding his failure to mention to officers or others at the murder scene that he had shot the victims in self-defense. Rather, because McMichen did speak to the officers and others on the scene about the shootings, the questions were proper inquiries into the inconsistency between McMichen's affirmative statements at the scene and his testimony at trial.[25]

(b) McMichen contends that the trial court erred in giving a charge on impeachment during McMichen's cross-examination. We find no error. The defense requested the instruction and made no objection after it was given.

(c) There is no merit to McMichen's contention that the court erroneously refused to instruct the jury regarding the state's burden of proof of the voluntariness of custodial statements made to law enforcement officers. No statement admitted at trial was arguably the result of custodial interrogation.

---

[24] See *Mobley v. State*, 265 Ga. 292, 294 (455 SE2d 61) (1995).
[25] See *Anderson v. Charles*, 447 U. S. 404, 407-409 (100 SC 2180, 65 LE2d 222) (1980).

12. McMichen contends that admission of the testimony of his cellmate Williams at the sentencing trial was improper. He contends that Williams' statements portraying McMichen as a misogynist were irrelevant and prejudicial and that the remainder of Williams' testimony recounting alleged statements made by McMichen was consistent with McMichen's own testimony and thus not impeachment. Furthermore, McMichen contends that the court should have given a limiting instruction, because Williams was a "snitch" who profited from testifying.

We find no error. Williams testified to McMichen's derogatory remarks about Luan while in jail and to McMichen's comment that his "only mistake" was not getting rid of the murder weapon. At the sentencing phase, all aspects of a defendant's crime, character and attitude are admissible, subject to evidentiary rules. Lack of remorse is a permissible area of inquiry, as is bragging about a crime.[26] There is no condition that the statements to be admitted must be impeaching. Finally, the record contradicts McMichen's assertion that Williams had an informal deal with the state.

13. McMichen contends that the trial judge should have disqualified himself, because he was a witness to an escape by state's witness Williams during Williams' trial. McMichen argues that the judge could conceivably be called as a witness, because as of the date of McMichen's trial, Williams had yet to be prosecuted for the escape, suggesting Williams might have benefitted by offering to testify against McMichen.

The trial judge did not err. Canon 3 (C) of the Canons of Judicial Conduct states that recusal may be warranted where the judge is "to the judge's knowledge, likely to be a material witness in the proceeding." The judge stated on the record that all he saw of Williams' escape was a broken door, which many others witnessed. Furthermore, Williams admitted at McMichen's trial that he had escaped. Therefore, it was reasonable for the judge to conclude that he was unlikely to be called as a material witness.

14. The trial court did not err in initially requiring McMichen to make a proffer, outside the presence of the jury, so that the court could assess the trustworthiness of hearsay statements allegedly made to him by the victims before the court admitted those statements under the "necessity" exception to the hearsay rule.[27] Furthermore, the issue is moot, because the state withdrew its objections, the proffer was discontinued, and none of the offered evidence was excluded. The state's use of the proffered testimony to impeach McMichen was

---

[26] *Isaacs v. State*, 259 Ga. 717, 723 (386 SE2d 316) (1989); *Frazier v. State*, 257 Ga. 690, 701 (362 SE2d 351) (1987).

[27] See *McKissick v. State*, 263 Ga. at 189.

proper, because testimony given under oath by a defendant may later be used for impeachment purposes if the defendant chooses to take the stand and testify.[28]

15. The trial court did not improperly allow testimony from the civil competency proceedings when it permitted the state to cross-examine McMichen about whether he had faked mental illness and memory loss for many months following the murders, and about his expert psychologist's conclusion that McMichen was malingering. McMichen opened the door by testifying on direct examination about the psychologist's treatment of him, and the prosecutor made no reference to the competency proceedings.

16. McMichen contends that the prosecutor improperly commented on a defense demonstration of the struggle between Mc-Michen and Robinson by standing and stating, "Judge, we don't want [defense counsel] to hurt [McMichen's] back and I object to the theatrics that just took place in this courtroom." McMichen urges that the court should have granted a mistrial or given a curative instruction and that the court erred in sustaining the state's objection. We find no abuse of discretion. The demonstration at issue consisted of the defense attorney having McMichen stand and display the shirt and jacket he wore during the shootings, whereupon counsel suddenly knocked McMichen to the floor backwards, shouting. Outside the jury's presence, the judge characterized the demonstration as a shocking outburst.

17. McMichen contends that the proceedings were fundamentally unfair, because the prosecutor repeatedly interjected irrelevant victim impact evidence in both phases of the trial. We have thoroughly reviewed each example cited by McMichen, and we find that each item of evidence was either clearly probative of issues at trial or was reasonably offered to rebut evidence introduced by McMichen in an attempt to cast aspersions on the victims and their families. An example of evidence in the latter category was the testimony of Luan's mother regarding her attempt to visit Katie after the murders. The testimony followed considerable irrelevant questioning by the defense designed to portray the witness as uncaring toward her grandchild. Evidence clearly probative of the issues at trial includes, for example, Katie's blood-stained shoes.

18. McMichen contends that the trial court erroneously failed to declare a mistrial after each of two instances of juror misconduct. We conclude that the trial court acted properly in each instance.

In one instance, the court received a note, presumably written by

---

[28] See *United States v. Quesada-Rosadal*, 685 F2d 1281, 1283 (11th Cir. 1982); *Felts v. State*, 244 Ga. 503, 505 (260 SE2d 887) (1979).

a juror, which read, "Copy of '88-'89 Ga. Hunting & Fishing Regulations." The note could be interpreted to reflect skepticism about, or a desire for corroboration of, McMichen's testimony that he typically took his .38 revolver — the murder weapon — on hunting trips. McMichen argued that the note clearly indicated that the jurors had begun deliberating before the conclusion of evidence. The court, however, noted the absence of any evidence that the jurors had discussed the subject matter of the note. The court reasonably concluded that the note merely reflected that its author was paying close attention to the evidence.

In the second instance, the defense presented an affidavit containing hearsay statements that one juror had said to his wife during a Sunday visit in the middle of trial that he wished they would "go ahead and fry" McMichen. After questioning the other jurors and learning that the juror in question had told at least one of them that he thought McMichen was probably guilty, the court excused the juror in question. Thereafter, the court adequately instructed the jury. Through questioning of the remaining jurors, the court determined that each of them could continue to serve.

19. McMichen contends that the prosecutor engaged in repeated misconduct in closing arguments in both phases of trial. In the guilt-innocence phase, the prosecutor argued that McMichen did not hold a steady job, was dishonest and had lied to the jury; that the jury would have to conclude that five-year-old Katie had lied in her videotaped interview before it could believe McMichen's testimony; and that a photograph of the victims with the new baby showed where Luan had wanted to go in her life. At the sentencing phase, the prosecutor spoke to the jury foreman directly and by name, explaining how to fill out the verdict form; stated the following: "Thank God you didn't go in the house and kill [the baby]"; argued that a life sentence would not be punishment; that the guilty verdict on each count of malice murder could supply the aggravating circumstance for the other; that McMichen was no longer entitled to the presumption of innocence; that the jury should recommend the death penalty if it found aggravating circumstances; that the jury could combine its findings of torture and depravity into one sentence on the verdict form; that certain letters introduced by defense counsel had "disappeared"; that McMichen did not call his psychologist as a witness because the testimony would have been bad for McMichen; and that the state had been limited in its presentation of evidence of the victims' good qualities.

In context, none of the prosecutor's remarks was improper or inappropriately prejudicial. For example, the comment about where Luan wanted to go in her life was relevant to malice. After the prosecutor stated that a life sentence would not be punishment, the court

gave an appropriate instruction. The state never argued that double murder alone would support the imposition of two death sentences. On the contrary, the state argued that it had proven five aggravating circumstances. The prosecutor clarified after objection that by saying the letters "disappeared" he meant only that they were not tendered into evidence.

20. McMichen contends that the jury charges at the guilt-innocence phase were fatally flawed in numerous respects. First, he argues that the court erred in failing to charge accident or involuntary manslaughter, because accident was McMichen's sole defense to the charge he murdered Luan. We find no error. McMichen conceded that he intended to fire his weapon, albeit at Robinson, when he shot Luan. Therefore, even assuming McMichen's defense is valid, the doctrine of transferred intent applies, and a charge of accident is not appropriate.[29] If McMichen were found to have acted in self-defense in shooting Robinson, he would have been acquitted of the murder of Luan even absent a charge on accident.

We likewise find no error in the remainder of the guilt-innocence phase charge. The court appropriately addressed justification, the elements of felony murder, lesser included offenses, aggravated assault, mutual combat, voluntary intoxication, inconsistent evidence, prior bad acts and reasonable doubt.

21. McMichen also contends that there were numerous significant errors in the sentencing phase jury charge. We disagree. The charge as a whole adequately conveyed that the sentence fixed by the jury would be imposed. The court's refusal to enumerate specific mitigating factors was proper, and the court clearly conveyed to the jurors that they were not limited in the factors they could consider in mitigation. The court properly declined to give several of McMichen's requested charges on the ground that they could mislead the jury. The charge as a whole adequately addressed the concepts in McMichen's requested charges, including reasonable doubt, credibility and the definition of terms included in the statutory aggravating circumstances. The court did not err in failing to charge that the jury could impose a sentence of life without parole. The life-without-parole statute[30] became effective after the date McMichen was indicted, and McMichen did not request that it apply.[31]

22. The trial court did not abuse its discretion by allowing the jury to view a videotaped interview of Katie McMichen a second time during deliberations. It is within a trial court's discretion to permit the jury at its instigation to rehear evidence after deliberations be-

---

[29] See *Lindsey v. State*, 262 Ga. 665, 666 (424 SE2d 616) (1993).

[30] OCGA § 17-10-16.

[31] See *Freeman v. State*, 264 Ga. 27, 28-29 (440 SE2d 181) (1994).

gin.[32] There is no error in not giving limiting instructions sua sponte.[33]

23. The record does not support McMichen's claim that the prosecutor failed to give proper notice of aggravating circumstances. Notice was provided before trial as required by OCGA § 17-10-2 (a).[34]

24. McMichen makes a general claim that the trial court erred in denying him adequate discovery. He first claims, without specificity, that he was denied impeaching and exculpatory information. We find no support for this contention in the record. The trial court reviewed documents in camera where appropriate, and the record does not contradict the court's position that the court compelled disclosure of all information to which McMichen was entitled. Also where appropriate, the prosecution volunteered access to evidence. McMichen requested the personnel files of law enforcement officers involved in his case, but he made no showing that they contained any report which would cast doubt on the officers' credibility. Such files bear no relevance to McMichen's guilt, innocence or appropriate penalty, and therefore the trial court was correct in denying McMichen access to those files.[35] In requesting the psychiatric histories of the state's witnesses, McMichen failed even to allege that such histories existed. Finally, the state is not required to disclose all statements made against a defendant.[36]

25. There is no merit to McMichen's contention that the Georgia statute providing for imposition of the death penalty is unconstitutional.[37] Furthermore, the method by which this court conducts its review of the proportionality of death sentences is constitutionally sound.[38]

26. Nor is there merit to McMichen's contention that the death penalty is unconstitutional because the district attorney has unfettered discretion.[39]

27. This Court has already rejected McMichen's contention that electrocution is cruel and unusual punishment.[40]

28. Death qualification of jurors is not unconstitutional.[41]

29. McMichen contends that the trial court erred in denying his request for separate panels of jurors for the guilt-innocence and sen-

---

[32] *Owens v. State*, 248 Ga. 629, 631 (284 SE2d 408) (1981); *Byrd v. State*, 237 Ga. 781, 782 (229 SE2d 631) (1976).

[33] *Walker v. State*, 264 Ga. 79, 81 (440 SE2d 637) (1994).

[34] See *Ross v. State*, 254 Ga. 22, 31 (326 SE2d 194) (1985).

[35] See *Taylor v. State*, 182 Ga. App. 494, 496 (356 SE2d 216) (1987).

[36] See *Zant v. Moon*, 264 Ga. 93, 100 (440 SE2d 657) (1994).

[37] See *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976).

[38] See *McCleskey v. Kemp*, 481 U. S. 279, 306-308 (107 SC 1756, 95 LE2d 262) (1987).

[39] See *High v. State*, 247 Ga. 289, 293-294 (276 SE2d 5) (1981).

[40] See *Stripling v. State*, 261 Ga. 1, 6 (401 SE2d 500) (1991).

[41] *Lockhart v. McCree*, 476 U. S. 162, 173 (106 SC 1758, 90 LE2d 137) (1986).

tencing phases of trial. He argues that qualification of jurors for service in the sentencing phase of a death penalty case destroys the jurors' presumption that the defendant is not guilty. He further argues that death qualified jurors are more "conviction prone." We have previously held, and reiterate, that use of death qualified jurors in the guilt-innocence phase of a death penalty case is not unconstitutional.[42]

30. The trial court did not err in refusing to permit McMichen to question potential jurors concerning the types of cases the jurors felt would warrant the death penalty.[43]

31. The trial court did not err by denying McMichen's challenges for cause to certain jurors. Taken as a whole, the voir dire of the jurors indicated that their views of capital punishment would not prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath.[44] Other statements of prospective jurors cited by McMichen as evidence of bias did not warrant disqualification for cause, because each of the jurors indicated an ability to be fair and impartial.[45] The court likewise did not err in failing to grant McMichen's motion to excuse an entire panel for cause after one prospective juror made disparaging remarks during general voir dire about the entire legal system. The trial court excused the prospective juror who made the remarks and determined upon questioning the remainder of the panel that the remarks would not affect the ability of any other juror to be fair and impartial. Finally, McMichen waived any objection to the qualification of the final juror about whom he complains.[46]

32. We find no error in the trial court's excusal of certain jurors for cause based on their opposition to the death penalty.[47]

33. (a) The trial court did not err in denying McMichen's motion for payment of the day care costs of potential jurors who were the primary caregivers for their children and were unable to pay the cost themselves. Nor did the trial court abuse its discretion in excluding a juror for cause due to child care responsibilities. While a blanket exclusion of primary caregivers of young children is incompatible with the need to draw juries from a fair cross-section of the community, a trial court has the discretion to excuse a parent from jury duty based upon a determination that service would impose an undue hardship on the individual parent.[48]

---

[42] *Pope v. State*, 256 Ga. 195, 200 (345 SE2d 831) (1986).

[43] See *Hall v. State*, 259 Ga. 412, 414 (383 SE2d 128) (1989).

[44] See *Alderman v. State*, 254 Ga. 206, 207 (327 SE2d 168) (1985).

[45] See *Foster v. State*, 258 Ga. 736, 737 (374 SE2d 188) (1988).

[46] See *Blankenship v. State*, 258 Ga. 43, 44 (365 SE2d 265) (1988).

[47] See *Ledford v. State*, 264 Ga. 60, 64 (439 SE2d 917) (1994).

[48] See *Thornton v. State*, 264 Ga. 563, 575 (449 SE2d 98) (1994).

(b) The trial court did not abuse its discretion by denying McMichen's motion for additional peremptory strikes.[49]

34. There is no merit to McMichen's contention that the prosecutor engaged in improper voir dire.

35. The trial court did not err in declining to make the jurors' handwritten notes a part of the record on appeal.

36. The provisions of the Unified Appeal and OCGA § 17-10-35 (a) providing for a report of the trial court in death penalty cases are not unconstitutional.[50]

37. We do not find that McMichen's death sentences were imposed under the influence of passion, prejudice or other arbitrary factor.[51] The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix support the imposition of the death sentence in this case.

*Judgment affirmed. Benham, C. J., Fletcher, P. J., Hunstein, Carley and Thompson, JJ., concur.*

APPENDIX.

*Osborne v. State*, 263 Ga. 214 (430 SE2d 576) (1993); *Hall v. State*, 261 Ga. 778 (415 SE2d 158) (1991); *Hightower v. State*, 259 Ga. 770 (386 SE2d 509) (1989); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Gilreath v. State*, 247 Ga. 814 (279 SE2d 650) (1981); *Strickland v. State*, 247 Ga. 219 (275 SE2d 29) (1981); *Mulligan v. State*, 245 Ga. 266 (264 SE2d 204) (1980); *Smith v. State*, 236 Ga. 12 (222 SE2d 308) (1976).

DECIDED JULY 14, 1995 —
RECONSIDERATION DENIED JULY 28, 1995.

*Michael Mears, Nancy Mau, Elizabeth A. Geoffroy*, for appellant.

*David McDade, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paige R. Whitaker, Assistant Attorney General*, for appellee.

---

[49] See *Frazier v. State*, 257 Ga. at 695.
[50] See *Gregg v. Georgia*, 428 U. S. at 167-168, 207; *Ward v. State*, 262 Ga. 293, 300 (417 SE2d 130) (1992); *Coley v. State*, 231 Ga. 829 (204 SE2d 612) (1974).
[51] See OCGA § 17-10-35 (c) (1).