684 S.E.2d 641 (2009)
McMICHEN
v.
HALL.
No. S09A1022.
Supreme Court of Georgia.
October 19, 2009.
*643 Robert G. Brazier, Baker, Donelson, Bearman, Caldwell & Berkowitz, Bryan M. Cavan, Miller & Martin, LLP, Thomas Howard Dunn, Atlanta, Robert L. McGlasson, McGlasson & Associates, PC, Decatur, for appellant.
Thurbert E. Baker, Attorney General, Patricia B. Attaway Burton, Senior Assistant Attorney General, Theresa Marie Schiefer, Assistant Attorney General, for appellee.
BENHAM, Justice.
Kim McMichen's wife, Luan McMichen, and her boyfriend, Jeff Robinson, were killed on November 16, 1990. At trial in 1993, McMichen claimed that he had killed Robinson in self-defense and that he had killed his wife by accident in the process. As to each death, McMichen was found guilty of murder and was sentenced to death. In 1995, this Court affirmed the convictions and death sentences unanimously. McMichen v. State, 265 Ga. 598, 458 S.E.2d 833 (1995). McMichen filed a petition for a writ of habeas corpus on January 3, 1997, and he amended the petition on September 19, 1997, and again on November 20, 2000. The habeas court held an evidentiary hearing on September 11-12, 2001, and it denied McMichen's petition in an order filed on September 24, 2007. On March 10, 2009, this Court granted McMichen's application for a certificate of probable cause to appeal. For the reasons set forth below, we affirm in part, vacate the final judgment denying the petition for writ of habeas corpus, and remand for further proceedings.
1. (a) In its order granting McMichen's application for certificate of probable cause to appeal, this Court directed the parties to address whether trial counsel rendered ineffective assistance of counsel in the manner in which they sought funds from the trial court for experts in forensic sciences. McMichen has further addressed two related questions, which are whether the trial court erred in denying trial counsel's motions for those funds and whether the trial court's denial of funds violated the Sixth Amendment by interfering with trial counsel's ability to render effective assistance of counsel at trial.
(i) As to the question we put forward, which is whether trial counsel rendered ineffective assistance in the manner in which they sought funds from the trial court for experts in forensic sciences, McMichen must show that his trial counsel rendered deficient performance and that actual prejudice of constitutional proportions resulted from counsel's combined deficiencies. Strickland v. Washington, 466 U.S. 668(III), 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Smith v. Francis, 253 Ga. 782(1), 325 S.E.2d 362 (1985). See also Schofield v. Holsey, 281 Ga. 809, 812, n. 1, 642 S.E.2d 56 (2007) (holding that the combined effect of trial counsel's errors should be considered in weighing prejudice in an ineffective assistance of counsel claim). This claim regarding any alleged deficiency in trial counsel's efforts to obtain funds is not barred in any fashion, because *644 claims regarding the alleged ineffective assistance of trial counsel may not be raised until after direct appeal in cases where, as was the case here, trial counsel serve as appellate counsel on direct appeal. Gibson v. Head, 282 Ga. 156(2), 646 S.E.2d 257 (2007).
McMichen also argues that this Court erred on direct appeal in holding that the trial court did not err by denying his trial counsel's request for funds for experts in forensic sciences. See McMichen v. State, supra, 265 Ga. at 603-604, 458 S.E.2d 833. As the Warden correctly notes, this claim is barred because it was raised and decided on direct appeal; however, McMichen argues that this Court has the power to revisit the claim based on "new facts," namely, the opinions rendered by the expert witnesses who testified in his habeas proceedings. See Gibson v. Ricketts, 244 Ga. 482(1), 260 S.E.2d 877 (1979); Brown v. Ricketts, 233 Ga. 809(1), 213 S.E.2d 672 (1975). The underlying merits of this claim, pretermitting whether the claim is barred, also hinge on the question of whether it was significantly prejudicial for McMichen to have been denied the expert assistance his trial counsel sought.
Finally, McMichen argues that the trial court's alleged error in denying funds for forensic experts rendered his trial counsel ineffective. He asserts that this Court should treat that issue as not being barred as res judicata by this Court's decision on direct appeal addressing the trial court's denial of funds but, instead, should treat the issue as a new, unbarred Sixth Amendment claim that has been raised at the first available opportunity. But see Ake v. Oklahoma, 470 U.S. 68, 87 n. 13, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (noting, but declining to address, the possibility that a trial court's denial of expert funds might raise Sixth Amendment concerns, in addition to due process concerns, that could be considered on direct appeal); Strickland v. Washington, supra, 466 U.S. at 686, 104 S.Ct. 2052 (noting that there are Sixth Amendment claims regarding governmental interference with the right to counsel that are distinct from claims regarding trial counsel's own deficient performance); Head v. Ferrell, 274 Ga. 399, 401(III), 554 S.E.2d 155 (2001) ("Claims, other than those regarding sentencing phase jury instructions in death penalty trials, that are raised for the first time in habeas corpus proceedings that could have been raised at trial or on direct appeal are barred by procedural default unless the petitioner can meet the `cause and prejudice' test."); OCGA § 9-14-48(d). This claim, pretermitting the issue of whether it is procedurally barred, can succeed only if McMichen can show that his right to counsel was significantly impaired by the trial court's denial of trial counsel's request for assistance from forensic experts.
Because all of the above-described claims, one which is properly raised and others which may or may not be, depend upon McMichen's ability to show that he suffered prejudice of constitutional proportions from the trial court's denying his trial counsel's request for funds for forensic experts, we address that issue below. See OCGA § 9-14-42(a) (providing for habeas relief where there has been a substantial violation of rights under the Constitution of the United States or the Georgia Constitution).
(ii) In support of his argument that he suffered prejudice from the trial court's denial of funds for experts in forensic sciences, McMichen's habeas experts make three essential assertions. The first assertion is that the State failed to preserve evidence, such as by documenting when photographs were taken at the crime scene. However, this assertion does nothing to establish affirmatively whether or not McMichen's claim of self-defense was valid. Furthermore, as the discussion below further explains, the State's theory at trial hinged primarily on factors other than the positioning of the victims' bodies and similar factors. Thus, expert opinion stating that evidence was not properly preserved by investigators would have had little impact on the jury's deliberations at trial.
The second assertion by McMichen's new experts is that the theory of the case presented at trial by the State was implausible. Our review of the trial transcript shows that, in making this assertion, McMichen slightly misstates the State's actual arguments. McMichen's trial counsel argued that the State was seeking to prove that McMichen *645 shot Jeff Robinson while standing behind his open truck door, but the district attorney argued in response that his theory actually was that "Mr. McMichen was probably standing on the side of his truck next to his door." (Emphasis supplied.) McMichen's new expert testimony suggests the State's theory was implausible because, based even on testimony by the State's witnesses at trial, the shot to Jeff Robinson's head was from a range of less than 12 inches. However, the exact position McMichen was standing, whether beside his truck door or at the front of his truck, was not an important part of the State's theory at trial, and the expert testimony the jury actually heard relevant to McMichen's distance from Jeff Robinson was almost identical to that presented by McMichen's new experts. McMichen's new experts further assert that the State's theory regarding the shooting of Luan McMichen was implausible because, under that theory, the bullet that passed through Luan McMichen's body would have struck the mobile home behind her, and yet no bullet was recovered from the mobile home. This assertion is also unpersuasive, because it incorrectly assumes that the State's theory required that McMichen was standing beside the driver's door of his truck rather than near to or at the front of the truck and because the fact that no bullet was recovered from the mobile home or from anywhere else does little to affirmatively indicate the actual trajectory of the bullet.
The third assertion made by McMichen's new experts is that the evidence is consistent with McMichen's own trial testimony, which was that Jeff Robinson struck him on the side of his head, lifted him from the ground by his coat, pushed him backward over the front of his truck, and then choked him. However, McMichen's arguments based on this third assertion by the new experts fail to take full account of the evidence actually presented at trial. McMichen argued at trial that he shot Jeff Robinson through the right ear as Robinson had him bent backward over the front of his truck and was choking him. The undisputed evidence at trial about the angle at which the shot entered Robinson's head and about the distance from which that shot was fired showed that both McMichen's and the State's theories were physically possible. Therefore, the issue of whether or not Robinson was attacking McMichen turned on a question of whether it was plausible that Robinson turned his head far to the left while choking McMichen rather than on any question of expert opinion on that subject. Regarding the shooting of Luan McMichen, McMichen fails to mention that the medical examiner testified under questioning by the State at trial that the bullet that killed Luan McMichen would have had a "downward trajectory" relative to the ground only "if the body of Ms. McMichen was standing straight upright." The medical examiner was then recalled by the defense and testified that the blood spatter from the wound to Jeff Robinson's ear would have been "minimal" but that it was likely that Jeff Robinson's ear wound would need to have been positioned over McMichen's shirt for "[n]o more than a couple of seconds" in order for the shirt to have received the blood stains removed from it. Thus, the question of whether McMichen fired the shot that killed Luan McMichen horizontally while bent backward over the front of his truck with Robinson attacking him or whether he shot downward at Luan McMichen while standing normally did not hinge at trial on any disputed question of expert opinion. Instead, the jury's finding of how Luan McMichen was killed hinged on the questions of whether it was likely that she would have leaned forward just before being shot and on the question of whether McMichen's claim that he was attacked by Jeff Robinson was credible, which was the critical issue at trial. The question of whether McMichen's claim of self-defense and accident was valid thus depended on evidence other than the forensic evidence. That other evidence included the following: McMichen's statement to a former girlfriend days before the murder that he planned to murder his wife and her boyfriend if he discovered that his wife's new baby was the boyfriend's; McMichen's history of harassing, raping, choking, and threatening to kill Luan McMichen; McMichen's history of arguing with Jeff Robinson while wielding a gun and unsuccessfully inviting Robinson to fight him; a neighbor's testimony that she heard McMichen say, "I've got something for you and *646 Luan both," shortly before the murders; the video-recorded statement of Katie McMichen, McMichen's daughter who was inside the victims' home during the murders, indicating that the shooting had started shortly after McMichen entered the home to retrieve his guns; McMichen's failure to mention any attack by Jeff Robinson when he spoke with neighbors, his mother, and investigators immediately after the murders; McMichen's telling a neighbor immediately after the murders that he was "just trying to scare" the victims; McMichen's spontaneously telling an investigator, "I f* * *ed up," as he was being led to an interrogation room; and witness testimony and photographs showing that there were no signs of an attack visible on McMichen's body in the minutes and hours following the murders.
In denying McMichen's claim below, the habeas court relied on this Court's statement on direct appeal that "McMichen's defense [wa]s clearly inconsistent with the physical evidence." McMichen v. State, supra, 265 Ga. at 604, 458 S.E.2d 833. Upon a new review of the trial transcript, we agree with McMichen's argument that this statement overly minimizes the physical possibility that Jeff Robinson could have turned his head while attacking McMichen and that Luan McMichen might have been leaning forward as she was shot. However, this Court continued further and concluded that "McMichen ha[d] failed to make the requisite showing that the issues to be addressed by the requested experts [we]re subject to varying expert opinion." Id. The foregoing discussion demonstrates that this latter statement by this Court remains true because all of the experts, both at trial and in the habeas court, have agreed that it is physically possible that McMichen could have killed the victims during an attack by Robinson but have said nothing definitive to show whether McMichen's version of events or the version of events suggested by the lay witnesses at trial was true. Accordingly, we conclude that all of the related claims raised in this appeal, each requiring a showing by McMichen that additional expert testimony of the kind he has presented in the habeas court could have aided him significantly at trial, must fail.
(b) McMichen argues that his trial counsel rendered ineffective assistance by using Dr. Dennis Herendeen, a psychologist who had counseled McMichen and his wife prior to the murders, to examine McMichen for, and then testify in, his competency trial. He argues that, if trial counsel had not used Dr. Herendeen for a competency evaluation, trial counsel could have called Dr. Herendeen later as a witness at the criminal trial to testify about what he learned as a marriage counselor to McMichen and his wife in the year and a half preceding the murders.
A review of the trial record reveals that, shortly after his arrest, McMichen began to exhibit signs of severe mental distress. He was non-communicative, would cower from visitors, and claimed not to remember even simple things like who his own mother was or what his own name was. Trial counsel testified in the habeas court that McMichen, prior to the competency trial, was "disheveled" and appeared to be severely confused and that trial counsel was convinced that McMichen was not competent. In light of McMichen's apparent distress, trial counsel successfully moved the trial court to transfer him from the jail to Central State Hospital, where he lived for five months, and to authorize funds for Dr. Herendeen to examine him. Dr. Herendeen was well suited to the task because of McMichen's negative reaction to other visitors and because of Dr. Herendeen's past rapport with McMichen. The following quotation from McMichen's motion for reconsideration regarding his request for funds for a new expert for trial emphasizes the appropriateness of trial counsel's decision to use Dr. Herendeen for the competency evaluation: "Dr. Herendeen was utilized at the competency stage because at that point in time Mr. McMichen ... was in a near catatonic state and distrustful of almost everyone including defense counsel." At the competency trial, Dr. Herendeen testified that, while he was probably severely depressed and had a personality disorder, McMichen was possibly malingering when he reported symptoms of amnesia and delusions. This testimony was consistent with the testimony from the State's witnesses from Central State Hospital, who testified that McMichen was malingering and that he had been *647 observed behaving normally when he was unaware of his being monitored. The trial record reveals that McMichen suddenly became mentally lucid after his competency trial was completed. Trial counsel testified in the habeas hearing that he "wasn't prepared for that sudden reversal in [McMichen's] demeanor" but that he still did not ascribe McMichen's sudden recovery to "any ill motive."
Trial counsel had good reason to believe that it was necessary to have someone that McMichen could trust examine him in preparation for the competency trial. The fact that, upon an extended examination of McMichen, Dr. Herendeen concluded that McMichen was quite possibly faking his symptoms cannot be evidence of trial counsel's shortcomings, as Dr. Herendeen and even the clinicians at Central State Hospital initially were impressed with McMichen's apparently-severe mental difficulties. The fact that McMichen may have deceived his own lawyer into believing that he was in acute mental distress is not a valid ground for finding unreasonable that lawyer's decision to have him examined by an expert with whom he was already comfortable. Accordingly, we conclude that McMichen has not shown that his trial counsel performed deficiently by using Dr. Herendeen for the competency trial. See Strickland v. Washington, supra, 466 U.S. at 687, 104 S.Ct. 2052 (holding that an ineffective assistance of counsel claim can succeed only upon a showing of both deficient performance and prejudice of constitutional proportions); Smith v. Francis, supra, 253 Ga. at 783, 325 S.E.2d 362.
Furthermore, even if one were to assume that trial counsel's decision to have Dr. Herendeen examine McMichen in preparation for the competency trial was unreasonable, McMichen cannot show prejudice. In this vein, we note that, even if trial counsel had not used Dr. Herendeen for the competency evaluation, using Dr. Herendeen's expert testimony at trial regarding his marital counseling of the McMichens would have opened up to the State on cross-examination everything he knew about the couple. A review of Dr. Herendeen's records reveals that his contact with McMichen prior to the murders was mostly with McMichen alone. Indeed, Dr. Herendeen testified in a pre-trial hearing that he had met with McMichen fifty times, that he had met with Luan McMichen only six times, and that he had met with Luan McMichen only one time after the couple separated. He also testified that he had worried that McMichen "might beat Luan up or physically harm her," although he had seen no evidence that it had occurred. Dr. Herendeen's records also reveal that McMichen sometimes reeked of alcohol during his office visits. Dr. Herendeen's habeas affidavit states as follows: "I should make clear that my view of that relationship [between the McMichens] was obviously formed without any anticipation of the ultimate tragedy that occurred in late 1990, and it is that view which I express in this affidavit." This comment begs consideration of an obvious line of questioning the State inevitably would have pursued if Dr. Herendeen had been called as a witness at trial, which is whether Dr. Herendeen's views regarding the McMichens' relationship would have been affected by the facts of the murder. The comment further begs consideration of how Dr. Herendeen would have reacted if confronted with trial testimony not only regarding McMichen's harassing his wife by calling her and coming to her work, things Dr. Herendeen does address in his affidavit, but also with testimony that he had raped his wife, had torn up her clothes, and had screamed at her co-workers when they would not reveal her new home address. It seems safe to assume that Dr. Herendeen's defense of McMichen at trial regarding these incidents would have been no more persuasive than was his defense of McMichen in the habeas court when confronted with McMichen's statement to an ex-girlfriend that he would kill Luan McMichen and her boyfriend if Luan McMichen's new baby proved to be the boyfriend's. Dr. Herendeen's habeas affidavit states that this threat "was nothing more than an expression of clear anger and frustration at having been abandoned and cheated on yet again by Luan rather than the expression of any actual desire or intent on his part to act upon that frustration in an intentional homicidal act against either her or her new lover." In light of the evidence that McMichen had *648 indeed murdered his wife and her boyfriend, an explanation such as this would have likely led the jury to believe that Dr. Herendeen's opinions were simply flawed. Although Dr. Herendeen's affidavit refers to an incident in which McMichen cut his own wrists, the affidavit indicates that McMichen's wounds were shallow and that the event was merely a "gesture" and "a cry for help and attention rather than a sincere effort to take his own life," testimony that would have proven only somewhat mitigating at trial. Likewise, if Dr. Herendeen had testified at trial as he has in his habeas affidavit that Luan McMichen manipulated her husband to facilitate her own desires for extramarital affairs and had little interest in having custody of the couple's daughter, Katie McMichen, that testimony would not have significantly affected the jury's deliberations, particularly because Luan McMichen's unfaithfulness and her willingness to be apart from her daughter, at least when necessary to avoid her husband, were already known to the jury. Finally, if Dr. Herendeen had offered expert testimony regarding his opinions about McMichen's mental state, the State would have countered with testimony from its own experts, who had observed McMichen's manipulative conduct while at Central State Hospital. In light of the foregoing, we conclude that, even assuming trial counsel performed deficiently by failing to preserve Dr. Herendeen's testimony about the counseling he provided to McMichen and his wife before the murders for use at the criminal trial, that failure did not create sufficient prejudice to support the success of McMichen's overall ineffective assistance of counsel claim. Id.
(c) Dr. Barry Scanlon is a psychiatrist that trial counsel consulted pre-trial. McMichen claims that trial counsel rendered ineffective assistance by failing to call him as a witness in the sentencing phase of McMichen's trial. Dr. Scanlon's habeas testimony revealed that he examined McMichen and reviewed his records, including those from Central State Hospital where McMichen lived for five months during his competency evaluation. Trial counsel's failure to present at trial the testimony from Dr. Scanlon that McMichen has presented in the habeas court was not deficient performance, because doing so would have allowed the State to present its own expert testimony, as it did in the competency trial, showing that McMichen had tried to deceive the doctors at Central State Hospital into believing that he had amnesia and delusions. Id. Furthermore, even assuming trial counsel performed deficiently, we conclude that McMichen did not suffer prejudice. Id. Dr. Scanlon's habeas testimony showed that McMichen suffered from depression and substance abuse, but these facts were known to the jury at trial. Dr. Scanlon's habeas testimony also provided some essentially irrelevant facts, such as the fact that McMichen had "non-pathological" sensory experiences when entering sleep as a child and the fact that McMichen's father was a somewhat passive person relative to McMichen's mother. Finally, Dr. Scanlon's habeas testimony provided other alleged facts, such as the fact that Luan McMichen was promiscuous and the fact that McMichen was devoted to his daughter, which could have been presented at trial only within the context of Dr. Scanlon's overall assessment of McMichen's mental status. However, if trial counsel had opened the subject of expert mental health opinions, the State would have presented its own, highly-unfavorable expert testimony.
(d) McMichen seeks to incorporate by mere reference all other specific claims of ineffective assistance that he raised in his amended petition or in his evidentiary hearing. We deem any such additional claims not specifically outlined in McMichen's brief to be abandoned. See Supreme Court Rule 22; Head v. Hill, 277 Ga. 255, 268(VI)(A), 587 S.E.2d 613 (2003) ("Hill's remaining ineffective assistance of trial counsel claims are so lacking in specific argument that they are incapable of being meaningfully discussed. We deem these claims to be abandoned.").
(e) Considering all of the instances of deficient performance that we have either found or assumed above, we conclude that they would not in reasonable probability have changed the outcome of McMichen's trial, and, accordingly, McMichen's ineffective assistance of counsel claim must fail. See Strickland v. Washington, supra, 466 U.S. at 687, 104 S.Ct. 2052 (holding that an ineffective *649 assistance of counsel claim can succeed only upon a showing of both deficient performance and prejudice of constitutional proportions); Smith v. Francis, supra, 253 Ga. at 783, 325 S.E.2d 362. See also Schofield v. Holsey, supra, 281 Ga. at 812, n. 1, 642 S.E.2d 56 (holding that the combined effect of trial counsel's errors should be considered in weighing prejudice in an ineffective assistance of counsel claim).
2. McMichen argues that the habeas court erred by failing to address, and grant relief based on, his claim that the State knowingly presented false testimony at trial from Gibson Williams. At the sentencing phase of McMichen's trial in 1993, Gibson Williams, a former jail mate of McMichen, testified that McMichen had referred to Luan McMichen disparagingly and that McMichen had stated that his one mistake was in not disposing of the gun. When he announced to the trial court that Williams might testify, the district attorney stated that Williams had not asked for anything in return and that there would be no deals for Williams's testimony. The State later provided trial counsel with a copy of the letter Williams had written pre-trial in which he offered information to the State, and this letter made no reference to any deal between Williams and the State. In both his pre-trial and trial testimony, Williams denied that he had been promised anything. However, in his testimony in the habeas court, Williams for the first time testified that he was approached by an investigator and promised assistance in shortening his sentence, that he was instructed by the investigator to write a letter to the district attorney but not to include anything about a deal in the letter, that the district attorney met with him and instructed him never to tell anyone that there was a deal for his testimony, and that he then lied when he gave his testimony in the trial court. Both the district attorney and the investigator testified in the habeas court and denied all of Williams's allegations. Williams, in the habeas court, identified a letter dated five years after McMichen's trial as a letter written by him to the district attorney after his parole was denied. The letter suggests that Williams received no assistance from the district attorney, and it makes no reference to any promise that the district attorney had previously made to give such assistance. Instead, the letter says, "I had hoped that seven years would satisfy you, obviously it has not." Williams also identified another letter, which is dated six years after McMichen's trial, in which he vented his anger toward the district attorney for taking an "unduly aggressive" approach in his case. This letter also makes no reference to any deal with the district attorney; instead, the letter states that Williams will never write to the district attorney again because Williams is unwilling to "snivel before [the district attorney] for mercy." As the foregoing summary of the evidence in the record demonstrates, establishing the facts relevant to this claim requires findings of credibility by the habeas court.
The Warden argues that this claim is, at least in part, barred as res judicata by this Court's discussion on direct appeal of a "general claim that the trial court erred in denying him adequate discovery," including "impeaching and exculpatory information." McMichen v. State, supra, 265 Ga. at 611, 458 S.E.2d 833. However, this argument has no merit, because the specific claim that the State knowingly presented false testimony from Gibson Williams was not raised or considered on direct appeal.
As the Warden correctly argues in the alternative, however, McMichen's claim that the State knowingly presented false testimony is, at least as an initial matter, barred by procedural default because it was not raised on direct appeal and, therefore, can be considered on its merits only if McMichen can satisfy the cause and prejudice test. Head v. Ferrell, supra, 274 Ga. at 401-402, 554 S.E.2d 155; OCGA § 9-14-48(d). Williams's pre-trial and trial testimony denying the existence of a deal, the district attorney's representation to the trial court that no deal existed, and the recentness of the recantation by Williams demonstrate cause sufficient to excuse counsel's failure to raise this claim at trial and on direct appeal. Thus, the fate of the procedural bar to this claim hinges on whether McMichen can show prejudice. This Court has held that, because the prejudice that must be shown to overcome procedural *650 default is a prejudice of constitutional proportions and because a habeas petitioner is entitled to relief only for constitutional violations, the prejudice prong of the cause and prejudice test is "co-extensive" with the merits of a claim of a constitutional violation. Waldrip v. Head, 279 Ga. 826(II)(H), 620 S.E.2d 829 (2005). Both to show prejudice and to succeed on the merits, McMichen would have to show that Williams's recent allegation that he and the district attorney lied at the time of trial is true and that there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103(II), 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).
Contrary to the Warden's arguments, we conclude that the habeas court failed to specifically address this claim regarding the allegedly-false trial testimony of Gibson Williams. This Court could affirm despite this omission by the habeas court if we could conclude that, even assuming the prosecution knowingly presented false testimony, there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. at 103(II), 96 S.Ct. 2392 However, we cannot reach that conclusion. Assuming we could reach such a conclusion regarding McMichen's guilt and the statutory aggravating circumstances necessary to authorize the death sentences, we could not reach a similar conclusion regarding the jury's selection of the final sentences for the murders. Once a jury concludes that a death sentence may be imposed, it must then grapple with the question of whether a death sentence should be imposed. A jury considering that question is charged that it may decline to impose a death sentence for any reason or for no reason at all. Suggested Pattern Jury Instructions, Criminal Cases (3d ed.), p. 72, § 2.04.50. Williams's sentencing phase testimony suggested that, even while sober and after time for reflection, McMichen was callous and hateful toward his deceased wife and regretted only that he had allowed himself to get caught. We cannot conclude that there is no reasonable likelihood that this testimony could have affected the jury's exercise of its complete discretion in weighing life versus death for McMichen. Thus, the resolution of this claim and the resolution of the parallel question of whether there is prejudice sufficient to overcome the procedural bar to this claim depend on findings of credibility and fact that have not yet been made. Accordingly, the habeas court's denial of McMichen's petition for a writ of habeas corpus is vacated, and the case is remanded for explicit findings of fact and conclusions of law regarding the allegedly-false trial testimony of Gibson Williams and for a new ruling on whether McMichen is entitled to a writ of habeas corpus. See Thomas v. State, 284 Ga. 327(2), 667 S.E.2d 375 (2008); OCGA § 9-14-49.
Judgment affirmed in part and vacated in part and case remanded with direction.
All the Justices concur.