## 44292. FORD v. THE STATE.
(360 SE2d 258)

WELTNER, Justice.

Melbert Ray Ford, Jr., was found guilty by a Newton County jury of murdering his former female companion, Martha Chapman Matich, and her 11-year-old niece, Lisa Chapman, and of committing the offenses of armed robbery, burglary, and possession of a firearm during the commission of a felony. He was sentenced to death on each of the murder convictions.[1]

*Facts*

After his relationship with Martha Matich broke up, Ford began harassing her by telephone. Two weeks prior to her death, Ford told a friend of his that he "was going to blow her . . . brains out." The day before her death, Ford unsuccessfully tried to convince a friend to drive him to the convenience store where Matich worked. Ford told the friend that he planned to rob the store and work revenge upon Matich by killing her.

On March 6, 1986, Ford talked to several people about robbing the store. He told one that he intended to kidnap Ms. Matich, take her into the woods, make her beg, and then shoot her in the forehead. Ford tried to talk another into helping him with his robbery (Ford

---

[1] The crimes were committed March 6, 1986. The case was tried October 20 through October 24, 1986. A motion for new trial was filed October 28, 1986, and amended December 16, 1986. After a hearing on that date, the motion was denied December 23, 1986. The case was docketed in this court January 18, 1987, and was orally argued April 7, 1987.

had no car). When this effort failed, Ford responded that "there wasn't anybody crazy around here anymore."

Finally, Ford met 19-year-old Roger Turner, who was out of a job and nearly out of money. By plying him with alcohol, and promising him that they could easily acquire eight thousand dollars, Ford persuaded Turner to help him.

They drove in Turner's car to Chapman's Grocery, arriving just after closing time. Ford shot away the lower half of the locked and barred glass door and entered the store. Turner, waiting in the car, heard screams and gunshots. Then Ford ran from the store to the car, carrying a bag of money.

At 10:20 p.m., the store's burglar alarm sounded. A Newton County sheriff's deputy arrived at 10:27 p.m. Ms. Matich was lying dead behind the counter, shot three times. Lisa Chapman was discovered in the bathroom, shot in the head but still alive, sitting on a bucket, bleeding from the head, and having convulsions. She could answer no questions. She died later.

Ford and Turner were arrested the next day. Turner confessed first and was brought into Ford's interrogation room to state to Ford that he had told the truth. Ford told him not to worry, that Turner was not involved in the murders. Afterwards, Ford told his interrogators that the shooting began after Martha Matich pushed the alarm button. He stated that, had he worn a mask, it would not have happened.

Ford claimed at trial that he was too drunk to know what was happening, and that it was Turner who entered the store and killed the victims.

### Issues[2]

1. In division one of his brief, Ford raises a number of constitutional objections to Georgia death penalty procedures, both generally and as applied to this case. Many of these arguments are resolved contrary to his contentions by *Gregg v. Georgia*, 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976), and *McCleskey v. Kemp*, 481 U. S. ___ (107 SC 1756, 95 LE2d 262) (1987).

In addition, he complains that, under our statutory death penalty procedure, all defendants convicted of both burglary and armed rob-

---

[2] Although Ford has filed 31 enumerations of error, his brief contains seven areas of argument. The subheadings for each of these seven arguments contain references to several enumerations of error, so that all 31 ostensibly are argued, but it is apparent that many are unsupported by argument or citation of authority. We address in this opinion all argued issues, and such additional ones as merit a response. See Ga. Unified Appeal Procedure Rule IV (B) (2), 252 Ga. at A-28. Any enumeration not specifically addressed has been reviewed and found to have no arguable merit.

bery in addition to murder enter the sentencing phase of the trial with two "built-in" statutory aggravating circumstances, allowing the state to obtain a death sentence without presenting *any* aggravating evidence at the sentencing phase of the trial. In such a case, Ford argues, the § b (2) statutory aggravating circumstances fail to narrow the class of death-eligible persons. See OCGA § 17-10-30 (b) (2).

This argument runs counter to the nature of aggravating evidence. It is true that a statutory aggravating circumstance "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U. S. 862 (103 SC 2733, 77 LE2d 235) (1983). See also, e.g., *Davis v. State*, 255 Ga. 588 (3c) (340 SE2d 862) (1986). But it is not true that only evidence presented at the sentencing phase may be considered in aggravation.

The factors normally considered in sentencing are (1) the character of the defendant, including his previous criminal activity, if any, and (2) the circumstances of the crime on trial. See, e.g., *Woodson v. North Carolina*, 428 U. S. 280, 304 (96 SC 2978, 49 LE2d 944) (1976).

Death penalty trials are bifurcated so that matters relevant to sentence, but irrelevant and prejudicial on the question of guilt — for example, a defendant's bad character and criminal record — can be withheld during the determination of guilt but can still be considered on the question of sentence. *Eberheart v. State*, 232 Ga. 247, 253 (206 SE2d 12) (1974). See also *Gregg v. Georgia*, supra, 428 U. S. at 190-91.

Unlike bad-character evidence, the circumstances of the offense are relevant both to guilt *and* to sentence, and evidence of the circumstances of the offense will be offered, usually, during the guilt-innocence phase of the trial. This evidence does not have to be re-presented at the sentencing phase of the trial in order to be considered on the question of sentence. The sentencing hearing "is for additional evidence and in no way excludes from consideration on sentence the matters heard on the issue of guilt or innocence." *Eberheart v. State*, supra.

Ford was eligible for the death penalty because in addition to committing murder, he contemporaneously committed a second murder, and armed robbery and burglary. OCGA § 17-10-30 (b) (2). Inasmuch as not all crimes of murder involve the contemporaneous commission of additional serious offenses, the § b (2) aggravating circumstance establishes a "second plane," separating "from all murder cases those in which the penalty of death is a possible punishment." *Zant v. Stephens*, 250 Ga. 97, 99 (297 SE2d 1) (1982). See also *Jefferson v. State*, 256 Ga. 821, 828-830 (353 SE2d 468) (1987). Proof that a defendant has committed several serious crimes in addition to

a single murder reasonably justifies the imposition of a more severe sentence.

In this case, the jury found that the murder of Lisa Chapman was committed while the defendant was engaged in the commission of the offenses of armed robbery and burglary, and that the murder of Martha Chapman Matich was committed while the defendant was engaged in the commission of the offenses of murder (of Lisa Chapman), armed robbery, and burglary. These findings properly support the death sentences imposed in this case, notwithstanding that all the evidence supporting these findings was introduced at the guilt-innocence phase of the trial.

2. Next, Ford argues that Georgia law unconstitutionally requires the imposition of the death penalty whenever mitigating circumstances do not outweigh aggravating circumstances.

We note that several states whose death penalty laws have been upheld by the U. S. Supreme Court require a jury to weigh the aggravating circumstances against the mitigating circumstances, and to impose a death sentence if the evidence in aggravation outweighs the evidence in mitigation. See *Zant v. Stephens*, supra, 462 U. S. at 873 (fn. 12). However, that is not the case in Georgia.

In this state, juries are not required to balance aggravating circumstances against mitigating circumstances. Rather, the death sentence may be considered only if the state establishes beyond a reasonable doubt at least one of the statutory aggravating circumstances set forth in OCGA § 17-10-30, and if such a circumstance is established, the jury nonetheless "may withhold the death penalty for any reason, or without any reason." *Smith v. Francis*, 253 Ga. 782, 787 (325 SE2d 362) (1985). See also *Zant v. Stephens*, supra, 250 Ga. at 100.

Contrary to the defendant's argument, no presumption ever arises under Georgia law that a death sentence should be imposed, nor does the law place any burden of proof upon the defendant.

3. Death qualification of prospective jurors is not unconstitutional. *Lockhart v. McCree*, 476 U. S. ___ (106 SC 1758, 90 LE2d 137) (1986). The trial court did not err by excusing prospective juror Gibbs after she answered that she could not vote to impose a death sentence regardless of the facts and circumstances of the case. *Alderman v. State*, 254 Ga. 206 (4) (327 SE2d 168) (1985).

4. The trial court conducted the voir dire by first examining prospective jurors with regard to publicity and feelings about the death penalty. Thirty-four of the sixty jurors who were questioned in this regard answered that they had "read, heard or seen" something about the case. These 34 were examined "individually in chambers." Three were excused, one because of conscientious objection to the death penalty, and two others because they "indicated some pre-existing feelings about the case, which they said would make it difficult . . . or

impossible for them to decide the case impartially . . ."

The trial court observed that "[n]o other jurors who were examined individually while being sequestered indicated any bias, leaning or prejudice or preconceived ideas at all about the case based upon any news reports or street talk or any other source of information they may have had about the case."

The court determined that the defendant could receive a fair trial in Newton County. We find no error in the denial of the defendant's motion for change of venue. *Curry v. State*, 255 Ga. 215 (2g) (336 SE2d 762) (1985).

Ford also contends that the court unnecessarily restricted the scope of the voir dire examination and denied him the opportunity to propound relevant and proper voir dire questions to prospective jurors.

Prior to trial, the defendant submitted a list of proposed voir dire questions. The court observed correctly that many of these questions were improper and would not be allowed. However, the court did not expressly rule at that time on any of the questions, expressing the belief that counsel for the defendant knew which questions were proper and which were not. Not a single question asked by the defense during the actual voir dire was disallowed. We find no error in the conduct of the voir dire.

5. Ford argues that the trial court should have declared a mistrial after the jury observed him in handcuffs, as he was being taken to lunch.

The jury left the courthouse first. After waiting during what they believed was a sufficient period of time for the jury to be removed from the area, two deputies walked Ford from the rear of the courthouse. Ford exited first and began descending the steps when he noticed the jury boarding a bus some 20 yards away. He was wearing an overcoat, the sleeves of which covered but did not completely hide the cuffs. Ford turned his back to the jury. He and the deputies then returned to the courthouse.

"Absent justifying circumstances, the defendant normally should not be seen by the jury handcuffed in the courtroom or courthouse. However, where one or more jurors by chance see the defendant in handcuffs outside the courtroom, it is not error to deny a motion for mistrial. [Cits.]" *Gates v. State*, 244 Ga. 587, 593 (261 SE2d 349) (1979).

The court did not err by failing to declare a mistrial in this case. The defendant did not object at trial to the curative instructions given by the court, and may not now complain that the instructions "served only to impress the incident upon the minds of the jurors."

6. Ford was advised of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), as soon as he was taken

into custody. He was transported to Newton County, re-advised of his *Miranda* rights, and then interrogated.

After it was relayed to Ford that co-defendant Turner had admitted his involvement in the robbery and the murders, and one of the interrogators told Ford that he believed Ford to have been responsible for the victims' deaths, Ford asked if he could "call his attorney." GBI agent Nicholson advised Ford that he could. Then Ford began questioning agent Nicholson about Turner's statement. Nicholson stopped Ford and told him that because he had asked for an attorney, they "could not continue the interview until he talked to one, unless he changed his mind and wanted to continue without it." Ford responded that he would like to continue the interview without his attorney.

Later on, Nicholson offered the defendant a chance to record his statement on video tape. Ford stated that he would like to confer with an attorney before making any recorded statements. Nicholson asked him "if he wanted to talk to an attorney before continuing on and he said he wished to continue the interview, but he didn't want to make any recorded statements until he talked with an attorney."

If an accused asserts his right to counsel during custodial interrogation, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U. S. 477, 484-85 (101 SC 1880, 68 LE2d 378) (1981).

Ford argues that his requests for counsel were not honored and that his rights under *Edwards v. Arizona*, supra, were violated. We do not agree.

Not only was his question about calling an attorney not a clear invocation of his right to counsel, compare *Smith v. Illinois*, 469 U. S. 91 (105 SC 490, 83 LE2d 488) (1984), the defendant "himself" initiated further conversation with the police. At this point, his interrogator was justified in stopping him and determining whether he wanted to call his attorney or to continue the interview. See *Hall v. State*, 255 Ga. 267 (336 SE2d 812) (1985).

Ford's later invocation of his right to counsel with regard to a video taped statement was an invocation of a limited right *only*, which the police were required to honor to no greater extent than the express limits of his reservation. *Connecticut v. Barrett*, 479 U. S. ___ (107 SC 828, 93 LE2d 920) (1987).

The trial court did not err by finding that Ford's statements were voluntary and that the defendant's rights as set forth in *Miranda v. Arizona*, supra, and *Edwards v. Arizona*, supra, were not violated.

7. The evidence supports Ford's conviction on two counts of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d

560) (1979). Contrary to Ford's contention, evidence was presented that Oliver Chapman owned the convenience store where his sister Martha Matich worked, and that Ford took $579.80 from the store. The evidence supports the defendant's conviction for armed robbery and burglary. See OCGA §§ 16-7-1 and 16-8-41. The court did not err by refusing to dismiss the charge of possession of a firearm during the commission of a felony, and the evidence supports the conviction for this offense. See OCGA § 16-11-106; *Miller v. State*, 250 Ga. 436 (298 SE2d 509) (1983).

## *Sentence Review*

8. The evidence supports the jury's findings with regard to the § b (2) aggravating circumstance. See Division 1 of this opinion. OCGA § 17-10-35 (c) (2). We do not find that the sentence was imposed under the influence of passion, prejudice or other arbitrary factor. OCGA § 17-10-35 (c) (1). The sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). The similar cases listed in the appendix support the death penalty in this case.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Romine v. State*, 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984); *Finney v. State*, 253 Ga. 346 (320 SE2d 147) (1984); *Spivey v. State*, 253 Ga. 187 (319 SE2d 420) (1984); *Roberts v. State*, 252 Ga. 227 (314 SE2d 83) (1984); *Putman v. State*, 251 Ga. 605 (308 SE2d 145) (1983); *Mincey v. State*, 251 Ga. 255 (304 SE2d 882) (1983); *Wilson v. State*, 250 Ga. 630 (300 SE2d 640) (1983); *Rivers v. State*, 250 Ga. 288 (298 SE2d 10) (1982); *Jones v. State*, 249 Ga. 605 (293 SE2d 708) (1982); *Berryhill v. State*, 249 Ga. 442 (291 SE2d 685) (1982); *Solomon v. State*, 247 Ga. 27 (277 SE2d 1) (1981); *Dick v. State*, 246 Ga. 697 (273 SE2d 124) (1980); *Jones v. State*, 243 Ga. 820 (256 SE2d 907) (1979); *Amadeo v. State*, 243 Ga. 627 (255 SE2d 718) (1979); *Corn v. State*, 240 Ga. 130 (240 SE2d 694) (1977); *Peek v. State*, 239 Ga. 422 (238 SE2d 12) (1977); *Birt v. State*, 236 Ga. 815 (225 SE2d 248) (1976); *Pulliam v. State*, 236 Ga. 460 (224 SE2d 8) (1976); *Dobbs v. State*, 236 Ga. 427 (224 SE2d 3) (1976); *Goodwin v. State*, 236 Ga. 339 (223 SE2d 703) (1976); *Mitchell v. State*, 234 Ga. 160 (214 SE2d 900) (1975); *Moore v. State*, 233 Ga. 861 (213 SE2d 829) (1975); *Gregg v. State*, 233 Ga. 117 (210 SE2d 659) (1974).

468

DECIDED SEPTEMBER 24, 1987 —
RECONSIDERATION DENIED OCTOBER 7, 1987.

*Crudup & Howell, John P. Howell,* for appellant.
*John M. Ott, District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Assistant Attorney General,* for appellee.