S93P0299. FUGATE v. THE STATE.
(431 SE2d 104)

SEARS-COLLINS, Justice.

Wallace M. Fugate III, was convicted by a jury in Putnam County for the murder of his former wife and sentenced to death. He appeals, raising 19 enumerations of error. We affirm.[1]

1. Fugate and the victim were divorced after almost 20 years of marriage. The victim lived with their son in the former marital residence, while Fugate moved to another town to minimize the likelihood that he would find himself in violation of a restraining order prohibiting him from having contact with his former wife. However, on Saturday, May 4, 1991, Fugate went to the victim's residence while she and the son were at work. (The son worked part-time at the same business as the victim.) According to Fugate, the victim had left him a note stating she would be in South Carolina that weekend, and he thought he would repair his son's automobile while they were gone. Fugate broke into the house soon after his wife and son left for work and stayed there from 9:00 a.m. until they returned home at 5:30 that

---

[1] The crime occurred May 4, 1991. Fugate was arrested early the next morning. The case came to trial on April 27, 1992. The trial concluded on April 27, 1992. A motion for new trial was filed and denied, after hearing, on October 23, 1992. The case was docketed in this court on November 25, 1992. Oral arguments were heard on February 16, 1993.

afternoon.

When the victim and the son returned home, they noticed that the son's car had been moved. She called her sister. The son testified that when he heard a noise in the basement, he got his rifle and ordered Fugate to come out. When Fugate appeared with a revolver in his hand, the son tried to shoot him because Fugate had threatened to kill the victim "if he ever caught her alone."

However, the son's rifle had been unloaded and disabled and would not fire. Fugate brushed past his son and went to the victim.

According to Fugate, he was surprised by the victim's return, and went to the basement thinking he would sneak out a back door and avoid a confrontation. However, there were too many locks on the back door, so he hid, hoping they would soon leave. When he was discovered, he went upstairs to his wife, who was calling the police, "mashed down" the receiver and told her to take him to the sheriff, thinking this would defuse the situation. However, she was scared — partly because he had a gun in his hand — and attacked him before he could put it in his pocket. As they fought their way out to her van, she knocked him down several times and tried to take away his gun. During the scuffle, the gun went off once inside the house, and a second time as he was trying to put her in her van. Both shots were accidents, according to Fugate. After the second shot mortally wounded her, he took the van and drove off.

According to the son, Fugate dragged the victim out to the van, pistol-whipping her when she resisted. He shot once in the house trying to scare her into obeying, and then, when he was unable to force her into her van, Fugate grabbed her hair, jerked her head back and shot her in the forehead. He dropped her body to the ground and drove off.

Besides the bullet wound in the forehead, the victim's body was bruised on the face, shoulders and arms and there was a blunt-force laceration on the back of her head. The son testified that Fugate had struck the victim at least 50 times before shooting her. A photograph of Fugate taken shortly after his arrest does not show that he suffered any visible cuts or bruises.

The jury found Fugate guilty of murder, burglary, kidnapping with bodily injury, two counts of aggravated assault and one count of theft by taking. The evidence supports the conviction on all counts.[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[2] Although Fugate contended to the contrary, the evidence supports the jury's finding that Fugate broke into the victim's house through the basement window and waited all day for her return intending to take her away with him against her will. Concerning the theft-by-taking count, it does not matter whether the victim survived for a few minutes or died immediately. *Lipham v. State*, 257 Ga. 808 (1) (b) (364 SE2d 840) (1988).

2. Fugate argues that the court should have instructed the jury on voluntary manslaughter as a lesser included offense of the charge of murder. However, not only did Fugate fail to make a written request for an instruction on voluntary manslaughter, but when, during the charge conference, the court read to the parties the court's proposed instructions as to "Count one, where the defendant is charged with murder" and asked the parties if either one had "any problem" with those instructions, Fugate's attorney answered that he had "no problems with that."

Pretermitting whether the evidence even authorized a charge on voluntary manslaughter, the omission to charge voluntary manslaughter clearly was not error where the defendant not only failed to request such a charge but affirmatively assented to the omission. *Graham v. State,* 250 Ga. 473 (5) (298 SE3d 499) (1983).

3. The court's instructions on reasonable doubt were not erroneous. *Potts v. State,* 261 Ga. 716 (14) (410 SE2d 89) (1991).

4. There was no deficiency in the court's instructions concerning kidnapping with bodily injury. *Waters v. State,* 248 Ga. 355 (10) (283 SE2d 238) (1981).

5. The trial court instructed the jury that in arriving at its sentencing determination:

You shall . . . consider the facts and circumstances, if any, in extenuation, mitigation and aggravation of punishment.

Mitigating or extenuating facts or circumstances are those which you, the jury, find do not constitute a justification or excuse for the offense in question, and which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. Aggravating circumstances are those which you, the jury, find [to] increase the guilt or enormity of the offense or add to its injurious consequences.

After further instructing the jury that a death sentence could be imposed only if the jury found beyond a reasonable doubt at least one statutory aggravating circumstance and designated that finding in writing, the court explained that, by contrast:

It is *not required* and it is *not necessary* that you find any extenuating or mitigating facts or circumstances in order for you to return a verdict setting the penalty to be imposed at life in prison. Whether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life in prison.

(Emphasis supplied.)

(a) Fugate contends, first, that these instructions failed adequately to define the nature and function of mitigating circumstances. We disagree. The instructions in this case more specifically defined the nature and function of mitigating circumstances than did those at issue in *Peek v. Kemp*, 784 F2d 1479 (11th Cir. 1986).[3] In this case, as did the Court in *Peek*,

> [W]e conclude that no reasonable juror could have failed to understand the meaning and function of mitigating circumstances.

Id. at 1489. See also *Ross v. State*, 254 Ga. 22, 33 (6) (326 SE2d 194) (1985).

(b) The trial court did not err, as Fugate contends, by failing to instruct the jury that its failure to agree unanimously on a verdict would result in a life sentence. *Romine v. State*, 256 Ga. 521 (1) (350 SE2d 446) (1986).

(c) Finally, Fugate contends the jury's consideration of mitigating circumstances was restricted by the court's instructions concerning unanimity.

The jury may not impose a death sentence unless it unanimously agrees upon at least one statutory aggravating circumstance beyond a reasonable doubt, and expresses this finding in writing. OCGA § 17-10-30 (c); *Ross v. State*, supra, 254 Ga. at 31. However, if the jury does "cross this threshold," ibid., it then considers *all* the evidence that has been presented preparatory to deciding what sentence to impose. In considering this evidence, the jury does not make further "findings" concerning what has been proved. *Conner v. State*, 251 Ga. 113, 119 (303 SE2d 266) (1983). Instead the jury must determine, based on a consideration of all the evidence, whether or not the defendant deserves a death sentence. *Zant v. Stephens*, 250 Ga. 97 (2) (297 SE2d 1) (1982). Only the threshold issue of at least one statutory aggravating circumstance and the ultimate decision of life or death must be agreed to unanimously, not "each and every evidentiary vignette." *Ross v. State*, supra at 31.

It is error to limit the jury's consideration of mitigating circumstances only to such as are "found" unanimously. Instead, the individual jurors must be allowed to consider whatever mitigating circumstances as are persuasive to each of them individually, thus giving the fullest play to the jury's consideration of mitigating circumstances. *Mills v. Maryland*, 486 U. S. 367 (108 SC 1860, 100 LE2d 384) (1988);

---

[3] In fact, the instructions in this case included the "clarifying instruction" the *Peek* court described as "manifestly desirable." Id. at 1490 (n. 12).

*McKoy v. North Carolina*, 494 U. S. 433 (110 SC 1227, 108 LE2d 369) (1990).

In *Brantley v. State*, 262 Ga. 786 (16) (427 SE2d 758) (1993), we reviewed a case in which the trial court had instructed the jury to consider mitigating circumstances in the same manner as it determined whether any statutory aggravating circumstances existed and had further instructed the jury to make written findings, signed by the foreperson, concerning mitigating circumstances. We concluded that these instructions could have been understood by reasonable jurors to impose a unanimity requirement on mitigating circumstances, that is, to restrict the jury's consideration of mitigating circumstances only to those the entire jury agreed upon. Thus, a reversal was required.

In this case, by contrast, the court did not require written findings on mitigating circumstances. In fact, the jury was explicitly instructed that such findings were not necessary or required. We do not find that reasonable jurors could have been misled by the instructions given in this case. There is no merit to this enumeration of error.

6. There was no reversible error in failing to excuse a prospective juror who was number sixty on the qualified panel, for two reasons. First, Fugate did not challenge the prospective juror. Second, the prospective juror was not necessary to the selection of the jury or the two alternates, and whether or not he was excused had no effect on the trial.[4] Compare *Pope v. State*, 256 Ga. 195, 202 (345 SE2d 831) (1986).

7. Because Fugate did not make a "substantive showing of the likelihood of prejudice by reason of extensive publicity," *Jones v. State*, 261 Ga. 665, 666 (409 SE2d 642) (1991), the trial court did not err by denying a change of venue.

8. In his 8th, 9th, 12th, 13th, and 15th enumerations of error, Fugate attempts to raise issues that were not timely raised at trial. These alleged errors have not been preserved for review. *Earnest v. State*, 262 Ga. 494, 495 (422 SE2d 188) (1992); Unified Appeal Procedure, § IV (A) (3).

9. In this case, the state bore the burden of proving beyond a reasonable doubt that, among other things, the defendant took the life of another human being. The state offered a photograph of the victim taken while she was still alive, as well as several taken after the

---

[4] Forty-two qualified jurors must be empaneled in a death penalty case to allow for twenty defense strikes, ten prosecution strikes and twelve jurors. OCGA § 15-12-165. Another eight are necessary to select two alternates — four defense strikes, two prosecution strikes and two alternates. OCGA § 15-12-169. The jury selection process did not reach — and could not have reached — prospective juror number sixty. Thus, juror number sixty was in no real sense "put on" the defendant.

defendant killed her. These photographs were highly relevant to issues properly in the case and were properly admitted. See *Spencer v. State*, 260 Ga. 640 (4) (398 SE2d 179) (1990); *Mincey v. State*, 251 Ga. 255 (11) (304 SE2d 882) (1983); *Blankenship v. State*, 247 Ga. 590 (8) (277 SE2d 505) (1981).

10. In his 14th enumeration, Fugate raises the issue of prosecutorial misconduct. All of the complaints here are raised for the first time after trial. Absent exceptional circumstances, claims of prosecutorial misconduct raised for the first time after trial "will not warrant reversal on appeal," *Spencer v. State*, supra, 260 Ga. at 646 (9).

Here, as in *Brantley v. State*, supra at (5), the claim of misconduct is based largely on the prosecutor's refusal to accept at face value the defendant's testimony about how the crime occurred and the prosecutor's willingness to suggest inferences from the evidence that were contrary to the defendant's claim of innocence.

The prosecutor, however, is entitled to be an adversary. Moreover, if the defendant testifies, his credibility becomes an issue, and the prosecutor is entitled to a thorough and sifting cross-examination of the defendant by means of leading (i.e., suggestive) questions. Id. at 792 (8).

The prosecutor was entitled to cross-examine Fugate about: (a) why he took a gun to his former wife's house if he did not intend to use it; (b) why he had the gun in his hand when he approached the victim if his intention was to defuse the situation; (c) why he "mashed down" the receiver and terminated her conversation instead of waiting until she was through, if he did not want to alarm her; (d) why he did not just exit by the front door if he was trying to avoid trouble; and (e) why he fled after the shooting if it was an accident. Moreover, the prosecutor was entitled to cross-examine Fugate about lies that by Fugate's own admission he had told, and to suggest that much of the rest of his testimony was lacking in truth. All of this was permissible cross-examination.

In addition, the prosecutor was entitled to draw reasonable inferences from the evidence during his closing argument, even if those inferences were contrary to the ones that Fugate would have preferred the jury to draw. The prosecutor did not, as the defendant contends, misstate the facts.

Fugate also complains that the prosecutor asked leading questions on direct examination. Leading questions generally are allowed only on cross-examination. OCGA § 24-9-63. However, the trial court has the discretion to allow leading questions on direct examination, where, for example, the witness is nervous, or ignorant, or hostile. Ibid. It would be a rare case in which the trial court's exercise of discretion on this issue would warrant reversal. Here, the court's discre-

tion was not even invoked, as the questions about which the defendant now complains were not objected to at trial. The mere fact that by parsing the record one may discover that the prosecutor "got by" with asking a few arguably leading questions on direct examination hardly supports a claim of prosecutorial misconduct.

There was no prosecutorial misconduct in this case. *Skipper v. State*, 257 Ga. 802 (3) (364 SE2d 835) (1988).

11. The prosecutor's sentencing-phase argument was supported by the evidence. Nothing here warrants reversal. *Todd v. State*, 261 Ga. 766 (2) (410 SE2d 725) (1991).

12. The issues raised in Fugate's 17th and 19th enumerations of error (concerning the lack of a trial judge's report and the date set for sentencing) are now moot.

13. The jury found as statutory aggravating circumstances that the murder was committed while the offender was engaged in the commission of the capital felony of kidnapping with bodily injury and while the offender was engaged in the commission of a burglary. See OCGA § 17-10-30 (b) (2). The evidence supports these findings. OCGA § 17-10-35 (c) (2).

14. We do not find that Fugate's death sentence was imposed as the result of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1).

15. The sentence of death is neither excessive nor disproportionate to penalties imposed in similar cases considering both the crime and the defendant. OCGA § 17-10-35 (c) (3). Fugate argues, in effect, that simply because he was once married to the victim a death sentence is unwarranted notwithstanding the cold-bloodedness and brutality of his crime. We do not agree. The similar cases listed in the Appendix support the imposition of a death penalty in this case.

*Judgment affirmed. All the Justices concur.*

### APPENDIX.

*Tharpe v. State,* 262 Ga. 110 (416 SE2d 78) (1992); *Lynd v. State,* 262 Ga. 58 (414 SE2d 5) (1992); *Ford v. State,* 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State,* 257 Ga. 243 (357 SE2d 48) (1987); *Alderman v. State,* 254 Ga. 206 (327 SE2d 168) (1985); *Wilson v. State,* 246 Ga. 62 (268 SE2d 895) (1980); *Redd v. State,* 242 Ga. 876 (252 SE2d 383) (1979).

DECIDED JUNE 21, 1993 —
RECONSIDERATION DENIED JULY 15, 1993.

*Lawrence & Ford, Francis N. Ford, Reginald L. Bellury,* for appellant.

*Joseph H. Briley, District Attorney, James L. Cline, Jr., Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Peggy R. Katz, Staff Attorney,* for appellee.