S00P0808. HEIDLER v. THE STATE.
(537 SE2d 44)

CARLEY, Justice.

A jury convicted Jerry Scott Heidler of the following offenses: four counts of malice murder; kidnapping with bodily injury; two counts of kidnapping; aggravated sodomy; aggravated child molestation; child molestation; and, burglary. For the murders, the jury recommended four death sentences, finding as the statutory aggravating circumstances that each homicide was perpetrated during Heidler's commission of the other three and that all four deaths occurred during his commission of a burglary. OCGA § 17-10-30 (b) (2). The trial court denied Heidler's motion for new trial, and he appeals.[1]

*Pre-Trial Issues*

1. Heidler claims that his confession resulted from an illegal arrest, but he waived the right to assert that issue on appeal by failing to raise it in the trial court. *Rushing v. State*, 271 Ga. 102, 104 (2) (515 SE2d 607) (1999); *Hardeman v. State*, 252 Ga. 286, 288 (2) (313 SE2d 95) (1984). The only objection made below related to the voluntariness of Heidler's statement, and that is the only question which this Court will now consider.

The trial court was authorized to find the following: Heidler was arrested at approximately 2:00 p.m. on the day the crimes were committed, and his interrogation began about 90 minutes later. The police read Heidler his rights and reviewed the waiver-of-rights form with him before he signed it. The interview lasted about two hours and culminated in a videotaped confession. Heidler was lucid, not

---

[1] The crimes were committed on December 4, 1997. The Toombs County grand jury indicted Heidler on March 10, 1998. The State filed its notice of intent to seek the death penalty on April 2, 1998. The trial was held in Walton County from August 23 to September 3, 1999. The jury convicted Heidler on all counts on September 2, 1999, and recommended the four death sentences the following day. In addition to the death penalties, the trial court sentenced Heidler to life imprisonment for kidnapping with bodily injury, twenty years for each kidnapping, life imprisonment for aggravated sodomy, thirty years for aggravated child molestation, twenty years for child molestation, and twenty years for burglary, all sentences to be served consecutively. Heidler filed a motion for new trial on September 20, 1999, which was amended on November 30, 1999, and was denied by the trial court on December 29, 1999. The case was docketed in this Court on February 3, 2000, and was orally argued on May 8, 2000.

intoxicated, and he appeared to understand his rights. He was twenty years old and had a tenth grade education. He was not handcuffed, and was provided with cigarettes and a soft drink. He was neither coerced, threatened, nor promised anything in exchange for his statement. He did not request a lawyer or ask that the questioning cease. When asked about the sequence of events and why they occurred, Heidler said several times that he was unsure because it was like "a dream." One of the interrogating officers volunteered to "get in the dream with him," and Heidler claims that this was coercive. However, a review of the record shows that the offer was simply an attempt on the part of the officer to prod Heidler's memory. Viewing the totality of the circumstances, we conclude that the trial court properly denied Heidler's motion to suppress his statement on the ground that it was involuntary. See *Lee v. State*, 270 Ga. 798, 800 (2) (514 SE2d 1) (1999); OCGA § 24-3-50.

2. Heidler claims a violation of *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963) based upon the purported failure of the State to turn over his Department of Family & Children Services (DFCS) records that were in its possession. However, the trial transcript shows that the prosecution made the DFCS records that it possessed available to the defense before trial, and that Heidler, in turn, furnished many of the records to mental health experts to assist in their pre-trial evaluations of him and that he also introduced a significant number of those records into evidence at trial. See *Pace v. State*, 271 Ga. 829, 836 (17) (524 SE2d 490) (1999); *Dennard v. State*, 263 Ga. 453, 454 (4) (435 SE2d 26) (1993) (no *Brady* violation when the alleged exculpatory evidence is available to the accused at trial); *Davis v. State*, 261 Ga. 382, 385 (8) (b) (405 SE2d 648) (1991) (no *Brady* violation when the alleged exculpatory evidence is presented to the jury at trial).

In addition, Heidler could, and did, obtain the records directly from DFCS by means of his own separate subpoena. See *Mize v. State*, 269 Ga. 646, 648 (2) (501 SE2d 219) (1998) (in order to prevail on *Brady* claim, defendant must show he could not obtain the exculpatory evidence on his own with any reasonable diligence). We find no violation by the State of Heidler's discovery rights.

### *Jury Selection*

3. The death penalty qualification of prospective jurors during the guilt-innocence phase of a capital case is not unconstitutional. *DeYoung v. State*, 268 Ga. 780, 790 (11) (493 SE2d 157) (1997). Heidler further contends that the trial court erroneously found to be qualified several prospective jurors who expressed a bias in favor of the death penalty, and compounded that error by striking for cause sev-

eral others who were not prejudiced against the imposition of that sentence.

> The proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "

*Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997), quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (II) (105 SC 844, 83 LE2d 841) (1985). We must base our review of the trial court's rulings in this regard upon a consideration of the voir dire as a whole. *Crowe v. State*, 265 Ga. 582, 588 (9) (a) (458 SE2d 799) (1995). There is no requirement that a prospective juror's qualification or disqualification appear with unmistakable clarity, since the trial court often has to resolve equivocations or conflicts in the responses on voir dire. *Ledford v. State*, 264 Ga. 60, 64 (6) (439 SE2d 917) (1994); *Jefferson v. State*, 256 Ga. 821, 823 (2) (353 SE2d 468) (1987). For this reason, this Court must pay deference to the trial court's determination of a prospective juror's qualification, and affirm the ruling below absent some manifest abuse of discretion. *Ledford,* supra.

(a) *Prospective Juror Howard.* According to Heidler, Mr. Howard was not qualified because he would not consider voting for life with the possibility of parole. The voir dire transcript shows, however, that Mr. Howard initially stated that he would consider all three sentencing options and any mitigating evidence. He was adamant that the death penalty is not appropriate for all murderers. Later, he did say that he could not vote for life with the possibility of parole for someone convicted of murder "without hearing all the evidence" and that he had negative feelings about parole "in some cases." However, he then agreed that he could vote for life with parole "if it was prove[n] to me that it was . . . worthy." Although he later seemed to equivocate somewhat, Mr. Howard complained that defense counsel had "confused me quite a bit" regarding the life with parole questions. The trial court itself then questioned Mr. Howard, and he replied that he never meant to say that he would not consider any sentencing option. Mr. Howard agreed that he would consider all of them, but that he would "have to hear the evidence first." Despite Mr. Howard's apparent confusion and seeming equivocation, his answers as a whole support the trial court's finding that he could consider all three sentencing options in accordance with his instructions and his oath. See *Bishop v. State*, 268 Ga. 286, 289 (6) (486 SE2d 887) (1997). Thus, we conclude that the trial court did not abuse its discretion by qualifying Mr. Howard to serve on the jury.

(b) *Prospective Juror Still.* Ms. Still stated that she was able to consider all three possible sentences and that her mind was not made up about any sentence before hearing the evidence. Later, she expressed some leaning toward the death penalty for one convicted of murder. However, in response to a question about whether she could ever vote for life with the possibility of parole, she stated "I wouldn't say I would never [vote for such a sentence because] I don't . . . know exactly what I would do in that situation [be]cause I've never been in that situation." She repeated that she would not automatically exclude life with parole, but that "the possibility would be strong" that she would vote for the death penalty. In response to a question by the trial court, however, she said she was not positive how she would vote because she did not know about the case. A prospective juror is not disqualified merely for expressing a leaning for or against the death penalty. "Instead, the relevant inquiry on appeal is whether the trial court's qualification of the juror is supported by the record as a whole. [Cit.]" *Mize,* supra at 652 (6) (d). Viewing the record as a whole and giving deference to the trial court's decision, we conclude that the trial court did not err by finding that Ms. Still's views about the death penalty did not impair her ability to serve on the jury. See *Mize,* supra; *Bishop,* supra.

(c) *Prospective Jurors Hawkins, Garrett and Silva.* Pretermitting Ms. Hawkins', Mr. Garrett's and Ms. Silva's voir dire responses, they were not among the first 42 qualified prospective jurors and could have been selected only as alternate jurors. Any error as to the qualification of the 43rd or subsequent prospective juror is harmless, unless use of an alternate juror becomes necessary. *Devier v. State,* 253 Ga. 604, 607 (3) (b) (323 SE2d 150) (1984). Since no alternate jurors were needed during the trial, the trial court's ruling that these three prospective jurors were qualified, if error, was not harmful. Compare *Pope v. State,* 256 Ga. 195, 202 (7) (e) (345 SE2d 831) (1986), overruled on other grounds, *Nash v. State,* 271 Ga. 281 (519 SE2d 893) (1999).

(d) *Prospective Juror Malcom.* Initially, Ms. Malcom expressed her belief that she could consider all three sentencing options and mitigation evidence. Later, she did state that "God didn't spare people to take other people's lives" and that a person who takes a person's life ought to have his life taken. However, she subsequently stated that she would not automatically vote to impose death for a convicted murderer, though she "probably would" vote for death. She expressed a belief in the death penalty, but agreed that, "if the court so provided other provisions, I would be willing to take a look at it." Upon questioning by the trial court, she said that she could fairly consider and vote to impose any one of the three possible sentences. Ms. Malcom's responses show that she was not irrevocably opposed to

consideration of any lawful sentence. Thus, we conclude that the trial court did not abuse its discretion by qualifying her to serve on the jury. *Mize*, supra; *Bishop*, supra.

(e) *Prospective Jurors Head, Campbell, Lambert, and Dockery.* Heidler did not challenge these four jurors for cause, and the trial court did not err by failing to excuse them sua sponte. See *Mize*, supra at 652 (6) (c); *Spencer v. State*, 260 Ga. 640, 641 (1) (a), (b) (398 SE2d 179) (1990).

(f) *Prospective Jurors Moon, Jordan and Swords.* Because these prospective jurors unequivocally stated that they would automatically vote against the death penalty regardless of the evidence, the trial court did not err by excusing them for cause. See *Greene*, supra.

4. The venue of Heidler's trial was changed from Toombs County to Walton County. Because the crimes received state-wide media attention, some prospective jurors in Walton County had heard about them. However, based upon a consideration of the entire voir dire transcript, we find that every prospective juror who had formed a fixed opinion about Heidler's guilt due to pretrial media exposure was excused by the trial court, and that all remaining prospective jurors were properly qualified to serve because they acknowledged the obligation to decide the case based solely on the evidence presented at trial. See *Irvin v. Dowd*, 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961); *Cromartie v. State*, 270 Ga. 780, 784 (9) (a) (514 SE2d 205) (1999).

### The Guilt-Innocence Phase of Trial

5. The evidence presented at trial authorized the jury to find the following: Danny and Kim Daniels lived in the town of Santa Claus in Toombs County with their seven children, three of whom were foster children. Heidler's sister was in the Daniels' care as a foster child for 45 days in 1995, and it was then that he began to frequent the house and occasionally to stay there overnight. Months before the murders, Mr. Daniels noticed that Heidler, 20 years old at the time, was beginning to develop a relationship with his 16-year-old daughter, Jessica. He had a conversation with Heidler, after which Heidler stopped visiting the Daniels' home.

At approximately 5:00 a.m. on December 4, 1997, the police in Bacon County found three young girls on the street in their nightclothes. The girls said they had been kidnapped from the Daniels' house in Toombs County by a man they knew as Scott Taylor, who drove them to Bacon County in a white van. The police subsequently learned from DFCS that "Scott Taylor" was actually Heidler. The ten-year-old victim told the police that Heidler sexually assaulted her in the van while in Toombs County. This was corroborated by evidence

of physical trauma to the child and by DNA testing. The eight-year-old victim told the police that she witnessed the sexual assault. From a photographic lineup, each of the three girls separately identified Heidler as the kidnapper.

Toombs County police officers went to the Daniels' house, where they found the bodies of the four victims. Bryant Daniels, eight years old, was found lying on his bed face-down, where he died from massive head trauma caused by a close-range shotgun blast. Both Mr. and Mrs. Daniels were found lying in their bed, each having been killed by multiple shotgun blasts. The body of Jessica Daniels also was found lying in the master bedroom, near a doorway that led into the hallway. She had been killed by a close-range shotgun blast to the back of her head. A Remington 1100 semi-automatic shotgun was missing from Mr. Daniels' gun cabinet, the door to which was open. Seven spent shotgun casings were found throughout the house. A firearms expert testified that the Remington 1100 shotgun holds six shotgun shells, so the shooter must have reloaded at least once. A neighbor heard, at 1:45 a.m., noises that could have been shots and the police determined that the assailant entered the house by using a ladder to climb through a bathroom window. A fingerprint lifted from this window matched Heidler's fingerprint. DNA taken from saliva on a cigarette butt found on the floor in the house matched Heidler's DNA.

After dropping the girls off in Bacon County, Heidler went to his mother's house where he slept and played video games with his brother. Heidler asked his brother if he had ever killed anyone, and his brother said no. Heidler then said that killing "gives you a rush, makes you want to go out and kill more people." After his arrest, Heidler confessed to the crimes. He told the police that he threw the shotgun into a river and the kidnapped girls confirmed this assertion.

The evidence was sufficient to enable a rational trier of fact to find proof of Heidler's guilt of four counts of malice murder, kidnapping with bodily injury, two counts of kidnapping, aggravated sodomy, aggravated child molestation, child molestation, and burglary beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

6. The trial court admitted into evidence five photographs of the victims taken at the crime scene, and Heidler contends these pictures were unduly inflammatory and cumulative of a videotape that also was shown to the jury. Pre-autopsy photographs of a murder victim are generally admissible if they show the nature and extent of the wounds and the relation of the body to other crime scene evidence, such as blood and shell casings. See *Jackson v. State*, 270 Ga. 494, 498 (8) (512 SE2d 241) (1999); *Crozier v. State*, 263 Ga. 866, 867 (2)

(440 SE2d 635) (1994). Still photographs are relevant and admissible for this purpose, even though they may be duplicative of a crime scene videotape. See *Jackson*, supra; *Foster v. State*, 258 Ga. 736, 740 (7) (374 SE2d 188) (1988). Heidler claims that the crime scene was altered in one photograph, but the police only removed the bed sheet that covered Mrs. Daniels' body. See *Foster*, supra. We conclude that the photographs were relevant and admissible.

7. The trial court admitted into evidence videotapes of police interviews with two of the kidnapped girls, the ten-year-old sexual assault victim and the eight-year-old who witnessed that attack. Because the girls did not testify at trial, Heidler claims that the Confrontation Clause was violated. However, he waived the right to raise this on appeal by failing to object to the admission of the videotapes on that ground. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

The trial court found sufficient indicia of reliability so as to render the evidence admissible in accordance with OCGA § 24-3-16, which permits the introduction of videotaped interviews of child sex abuse victims. See *Vick v. State*, 194 Ga. App. 616 (1) (391 SE2d 455) (1990). Each girl was interviewed separately by a law enforcement officer and a DFCS caseworker trained to conduct this type of interview. The videotaped interviews took place only a few hours after the sexual assault and the evidence supports the trial court's finding that the interviewers did not coach the girls, and that the children's responses were consistent, spontaneous and credible. See *Allen v. State*, 263 Ga. 60, 61 (2) (428 SE2d 73) (1993); *Newberry v. State*, 184 Ga. App. 356 (2) (361 SE2d 499) (1987). The girls were also available to testify if Heidler desired to cross-examine them. *Allen*, supra. We find no error in the trial court's admission of the videotapes pursuant to the Child Hearsay Statute.

8. Heidler did not object to testimony concerning the van which he stole before the murders and then used during the abduction of the girls. *Earnest*, supra. Even if he had objected, the evidence clearly was admissible as part of the res gestae of the crimes for which he was being tried. See *Nance v. State*, 272 Ga. 217, 221 (4) (526 SE2d 560) (2000).

9. Heidler made a pre-trial announcement of his intent to raise mental illness and insanity as his defenses. Accordingly, the trial court ordered that he undergo a separate independent evaluation by three psychologists or psychiatrists. See *Nance*, supra at 218 (2). Although the defense rested in the guilt-innocence phase without presenting any evidence, the trial court allowed the three experts to testify with regard to Heidler's mental health. On appeal, Heidler urges that the trial court erred in permitting this testimony, because a State or court-ordered mental health expert may only appear as a

rebuttal witness. *Nance*, supra. The record shows, however, that Heidler's defense counsel actually urged the trial court to allow the expert witnesses to testify and, in fact, the State objected to this procedure on most of the same grounds that Heidler now urges on appeal. A party cannot request a ruling from the trial court and then, on appeal, take the contrary position and complain that the ruling was error. *Pye v. State*, 269 Ga. 779, 787 (14) (505 SE2d 4) (1998) ("A party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later."); *Barnes v. State*, 269 Ga. 345, 356 (19) (496 SE2d 674) (1998) (invited error is not grounds for reversal). Thus, we find no reversible error in allowing the experts to testify in this case, even though they were not called as rebuttal witnesses.

10. At one point during the State's closing argument, the prosecutor asked the jury to hold Heidler to the same standard "you hold me." Heidler objected, claiming that this suggested that he was required to prove his innocence. According to the attorney for the State, however, he was only referring to the presumption of sanity and to the absence of any evidence that Heidler was insane. See *Parker v. State*, 256 Ga. 363, 365 (1) (349 SE2d 379) (1986) (Georgia law presumes sanity and insanity is an affirmative defense); *Brown v. State*, 250 Ga. 66, 70 (2) (c) (295 SE2d 727) (1982); OCGA § 16-2-3. The trial court ruled that this explanation was adequate, and we conclude, based upon the context of the remark and the explanation, that there was no error.

Heidler did not object to any other portion of the State's closing argument, and thus he waived any right to seek a reversal based thereon. *Gissendaner v. State*, 272 Ga. 704, 713 (10) (b) (532 SE2d 677) (2000). In accordance with our duty under OCGA § 17-10-35 (c) (1), however, we have made an independent examination of the prosecution's closing argument to determine whether, if improper, it had any effect on Heidler's resulting death sentences. We conclude that there is no reasonable probability that the argument " 'changed the jury's exercise of discretion in choosing between life imprisonment or death.' " *Gulley v. State*, 271 Ga. 337, 347 (14) (519 SE2d 655) (1999). Nor is there any evidence of prosecutorial misconduct. *Gulley*, supra at 346 (10); *Roberts v. State*, 267 Ga. 669, 671 (3) (482 SE2d 245) (1997).

11. Heidler's assertion that his entry into the Daniels' residence was authorized is based on speculation only. The actual evidence shows that he entered the home by using a ladder to climb through a bathroom window in the early morning hours, when the occupants were in nightclothes and in bed, and that he stole a shotgun and committed murders once inside. See *Raulerson v. State*, 268 Ga. 623, 624 (1) (491 SE2d 791) (1997). Thus, the trial court properly charged the

jury on the crime of burglary. Heidler also complains that the trial court erred by instructing the jury on felony murder, but any issue in that regard is moot since the jury convicted him of malice murder. *Lee*, supra at 801 (4).

12. The trial court charged the jury that the possible verdicts included a finding that Heidler was not guilty by reason of insanity, that he was guilty but mentally ill, or that he was guilty but mentally retarded. The trial court did not err in failing also to instruct on delusional compulsion, OCGA § 16-3-3, because Heidler never requested such a charge, the evidence did not support it, and the defense never suggested that he was acting under a delusional compulsion when he committed the crimes. See *Wellons v. State*, 266 Ga. 77, 87 (16) (463 SE2d 868) (1995).

The trial court properly charged on the burden of proof necessary to support a finding of guilty but mentally ill. *Spivey v. State*, 253 Ga. 187, 188 (2) (319 SE2d 420) (1984). Contrary to Heidler's further contentions, the controlling statutory provision regarding such a verdict, OCGA § 17-7-131, is not unconstitutional. *Salter v. State*, 257 Ga. 88, 90 (3) (356 SE2d 196) (1987).

The instruction on reasonable doubt was a correct statement of the law. *Rucker v. State*, 270 Ga. 431, 433 (3) (510 SE2d 816) (1999). The trial court also properly charged that the jurors "not be swayed in your deliberations by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling." See *Dill v. State*, 254 Ga. 17 (1) (325 SE2d 765) (1985); *Duggan v. State*, 225 Ga. App. 291, 295 (3) (483 SE2d 373) (1997). Compare *Legare v. State*, 250 Ga. 875, 878 (2) (302 SE2d 351) (1983) (error to charge jury in penalty phase not to consider sympathy when determining sentence).

With regard to aggravated sodomy, the trial court instructed that "a female under 16 years of age is legally incapable of giving consent. . . . A person commits aggravated sodomy when that person commits sodomy with force and against the will of the other person." Contrary to Heidler's assertion on appeal, this charge did not instruct the jury to presume force when a person under the legal age of consent is sodomized. By its terms, the instruction relates only to the presumption of an underage victim's lack of consent, and it constitutes a correct statement of the law in that regard. See *Brewer v. State*, 271 Ga. 605, 606 (523 SE2d 18) (1999); *State v. Collins*, 270 Ga. 42-43 (508 SE2d 390) (1998).

13. Heidler never requested a charge on theft by taking and manslaughter as lesser-included offenses of burglary and murder respectively, and the trial court did not err by failing to charge on those crimes sua sponte. See *Hawkins v. State*, 267 Ga. 124, 125 (3) (475 SE2d 625) (1996); *Fugate v. State*, 263 Ga. 260, 262 (2) (431 SE2d 104) (1993); *Graham v. State*, 250 Ga. 473, 476 (5) (298 SE2d

499) (1983).

14. After the charge, the State objected that the trial court might have misled the jury regarding the disposition of Heidler if he was found guilty but mentally retarded. The trial court agreed, and recharged that such a verdict would preclude further deliberations regarding Heidler's punishment and that he would be sentenced to life with the possibility of parole. Giving this recharge was error, since, in the guilt-innocence phase, the trial court should not inform the jury that the defendant will not receive a death sentence if he is found guilty but mentally retarded. *State v. Patillo*, 262 Ga. 259, 260-261 (417 SE2d 139) (1992).

However, insofar as the harmful effect of the recharge is concerned, a review of the record shows that all three court-appointed mental health experts testified that Heidler was not mentally retarded and that he had an IQ in the low-average range. There was no evidence presented to the contrary. In fact, Heidler's counsel conceded this point on closing argument by telling the jury:

> In any event, there's no evidence of mental retardation in this case at all. That's the point I wanted to make. And so you would not have anything to consider regarding mental retardation. So . . . we're not going to suggest to you that it is in order to get our client off or anything like that. The evidence is that he has subnormal intelligence, and the evidence from all three mental health professionals subnormal intelligence, but not mentally retarded. All three said not mentally retarded. So I hope that it – maybe that'll make your deliberations a little easier.

Therefore, the erroneous recharge could not have harmed Heidler, as it did not prejudice the jury against the return of a lawful verdict. A finding that he was guilty but mentally retarded would not have been authorized in any event. Since the error was harmless beyond a reasonable doubt, a reversal is not mandated as to the convictions entered on the authorized finding that Heidler committed the offenses and that his guilt was undiminished by his mental condition.

15. Count 8 of the indictment charged that Heidler committed aggravated sodomy by performing "anal sodomy" upon the kidnap victim, "age 10," with force and against her will. Count 9 of the indictment charged that he committed aggravated child molestation by performing the immoral and indecent act of "anal sodomy" against a child under the age of 16. Although the evidence presented at trial showed that there was only one act of anal sodomy, the jury found Heidler guilty of both counts, and the trial court imposed sentences

as to each offense. However, the single act was necessary to prove the aggravated sodomy count of the indictment, so that there was no remaining evidence upon which to base Heidler's conviction for an additional count of aggravated child molestation. See *Wyatt v. State*, 222 Ga. App. 604, 606 (2) (475 SE2d 651) (1996); *Horne v. State*, 192 Ga. App. 528, 533 (6) (385 SE2d 704) (1989); OCGA § 16-1-7 (a) (1). Under the facts of this case, the aggravated sodomy conviction includes the aggravated child molestation charge plus the additional element of force. See *Brewer*, supra at 606-607. Accordingly, the aggravated child molestation conviction merged into the aggravated sodomy conviction as a matter of fact, and we therefore reverse Heidler's conviction and sentence for the crime charged in count 9 of the indictment. *Wyatt*, supra; OCGA § 16-1-7 (a).

16. There is no evidence that the jury, which was sequestered during the trial, was affected by news coverage.

### The Sentencing Phase of Trial

17. Heidler complains generally that the trial court improperly conducted the penalty phase of his trial. However, his reliance upon the admission of testimony from the three expert witnesses in the guilt-innocence phase is clearly without merit, since he specifically requested that the trial court allow that testimony. See *Barnes*, supra at 356 (19). Although he also complains about the failure of DFCS witnesses to produce certain records, they were not the State's witnesses, but rather his own. Insofar as the testimony of Dr. Maish, Heidler's mental health expert, is concerned, the trial court properly sustained or overruled the State's various objections to his testimony.

At the conclusion of Dr. Maish's testimony, he responded in the negative when the trial court inquired whether Heidler was mentally retarded. On appeal, Heidler claims that the trial court erred in asking this question, but, at trial, defense counsel said, "I forgot to ask that" and he then proceeded to question Dr. Maish about Heidler's intellectual testing. Since there was no objection, the argument that the trial court erred in posing the question is waived for appeal purposes. *Earnest*, supra at 495 (1).

We also conclude that, contrary to the assertions on appeal, the trial court did not improperly restrict Heidler's presentation of mitigation evidence. See *Barnes*, supra at 357-360 (27).

18. Heidler claims that the State improperly introduced evidence that he committed prior crimes as a juvenile. However, defense counsel called an employee of the Department of Juvenile Justice as its mitigation witness and, on direct examination, elicited testimony that Heidler had an altercation with his stepfather when he was 14 or 15 years old. On cross-examination, the prosecutor asked what

Heidler had done, and the witness responded that there had been an assault with a knife. This was perfectly acceptable cross-examination. OCGA § 24-9-64. Moreover, Heidler did not object, so the issue is waived on appeal. *Earnest*, supra at 495 (1). Additional complaint about the State's cross-examination of a DFCS caseworker regarding Heidler's commission of a previous burglary is without merit for the same reasons. *Earnest*, supra.

19. The prosecutor's conduct and argument in the penalty phase were not improper. *Gulley*, supra at 346 (10); *Pye*, supra at 788 (19); *McClain v. State*, 267 Ga. 378, 385 (4) (a) (477 SE2d 814) (1996).

20. Because the jury was entitled to consider the evidence presented in both phases of the trial when determining the sentence, the trial court properly refused to charge that the jurors should not consider Heidler's commission of the murders as aggravating evidence. See *Romine v. State*, 256 Ga. 521, 528 (3) (350 SE2d 446) (1986); *Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985) (jury may consider evidence presented in both phases of the trial when determining sentence).

The trial court properly instructed the jury to consider mitigating circumstances, and that it could impose a life sentence for any reason or no reason at all. See *Jenkins v. State*, 269 Ga. 282, 295 (24) (498 SE2d 502) (1998); *Romine*, supra at 529-530 (3). The trial court also correctly charged on the nature and function of mitigating circumstances. *Fugate*, supra at 263 (5) (a). Since the trial court is not required to identify specific mitigating circumstances in the charge, it did not err by refusing to instruct the jury to consider residual doubt as such a circumstance. *Jenkins*, supra at 296 (25). Also, the trial court was not required to instruct the jury on the consequences of a deadlock or to give the jury that option as a possible verdict. *Jenkins*, supra at 296 (26). The trial court did not err in failing to give several of Heidler's requested charges, the substance of which was otherwise covered by the trial court's instructions.

21. A juror had plane tickets for a trip scheduled to begin on the evening of the last day of deliberations, but there is no evidence that she felt pressured into arriving at a verdict. The trial court assured her that she would be reimbursed for the tickets if the deliberations continued past her departure time. Moreover, Heidler did not object to the trial court's handling of this matter, so this issue is waived on appeal. *Earnest*, supra at 495 (1).

22. It was not improper to submit to the jury every statutory aggravating circumstance supported by the evidence. *Jenkins*, supra at 294 (23) (b); OCGA § 17-10-30 (b). However, as an aggravating circumstance supporting the death penalty for each of the murders, the jury relied upon Heidler's commission of the other three. In accordance with the principle of "mutually supporting aggravating cir-

cumstances," one of the murders can serve as the aggravating factor in Heidler's commission of the other three, but none of those three murders can, in turn, serve as the aggravating circumstance for his commission of the fourth. *Burden v. State,* 250 Ga. 313, 315 (6) (297 SE2d 242) (1987). See also *Jenkins,* supra at 294 (23) (a); *Wilson v. State,* 250 Ga. 630, 638 (9) (300 SE2d 640) (1983). Accordingly, we arbitrarily determine that the murder of Mr. Daniels is a statutory aggravating circumstance as to Heidler's commission of the murders of each of the other three victims, and set aside those three murders as a statutory aggravating circumstance in Heidler's murder of Mr. Daniels. See *Waters v. State,* 248 Ga. 355, 368 (12) (283 SE2d 238) (1981). We are not required to reverse any of the death sentences, however, because all four are based upon Heidler's commission of a burglary as an additional, independent valid statutory aggravating circumstance. *Jenkins,* supra.

23. Georgia's statutory death penalty scheme is constitutional. *Gregg v. Georgia,* 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976); *Thomason v. State,* 268 Ga. 298, 312 (11) (486 SE2d 861) (1997); *McMichen v. State,* 265 Ga. 598, 611 (25) (458 SE2d 833) (1995).

24. The Unified Appeal Procedure is not unconstitutional. *Jackson,* supra at 498 (10); *Wellons,* supra at 91 (33).

25. Heidler filed a "Motion to Bar Execution by Electrocution," and claims on appeal that the trial court's failure to hold an evidentiary hearing on this motion constitutes error. The record shows, however, that Heidler was permitted to and did proffer over 400 pages of documents, including hearing transcripts and autopsy reports, regarding the procedures and effect of execution by electrocution. He fails to specify what additional evidence he would have presented had the trial court ordered an evidentiary hearing, and we therefore conclude that the trial court did not err by holding no evidentiary hearing on this motion. See *Pace,* supra at 833 (6). We also conclude that the trial court correctly ruled that execution by electrocution is not unconstitutional. *Gissendaner,* supra at 716 (15); *Morrow v. State,* 272 Ga. 691, 703 (17) (532 SE2d 78) (2000); *Pruitt v. State,* 270 Ga. 745, 749 (6) (514 SE2d 639) (1999); *Perkins v. State,* 269 Ga. 791, 797 (8) (505 SE2d 16) (1998); *Wellons,* supra at 91 (32).

26. The evidence was sufficient to authorize the jury to find beyond a reasonable doubt the commission of the statutory aggravating circumstances which supported the death sentences for the murders. *Jackson v. Virginia,* supra; OCGA § 17-10-35 (c) (2).

27. The death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). The death sentences are neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant. OCGA § 17-10-35 (c) (3). In addition to the evi-

dence of the four murders and the other crimes for which Heidler was convicted, the State presented extensive aggravating evidence in the penalty phase, including an escape attempt before trial which resulted in his re-apprehension miles from the jail, numerous weapons which he made while he was incarcerated, repeated threats to kill guards, derogatory comments about the victims, and remorseless comments about the murders, such as a boast that he was a "collector of souls" who was not through with his collection. The similar cases listed in the Appendix support the imposition of the death penalty in this case, in that all involve the deliberate, unprovoked murder of two or more people or a murder committed during a burglary.

*Judgment affirmed in part and reversed in part. All the Justices concur, except Fletcher, P. J., who concurs in the judgment and in all Divisions except Division 25, and Benham, C. J., and Sears, J., who concur in part and dissent in part.*

APPENDIX.

*Morrow v. State,* 272 Ga. 691 (532 SE2d 78) (2000); *Pace v. State,* 271 Ga. 829 (524 SE2d 490) (1999); *Gulley v. State,* 271 Ga. 337 (519 SE2d 655) (1999); *Palmer v. State,* 271 Ga. 234 (517 SE2d 502) (1999); *Cook v. State,* 270 Ga. 820 (514 SE2d 657) (1999); *Jenkins v. State,* 269 Ga. 282 (498 SE2d 502) (1998); *DeYoung v. State,* 268 Ga. 780 (493 SE2d 157) (1997); *Raulerson v. State,* 268 Ga. 623 (491 SE2d 791) (1997); *McMichen v. State,* 265 Ga. 598 (458 SE2d 833) (1995); *Stripling v. State,* 261 Ga. 1 (401 SE2d 500) (1991); *Ford v. State,* 257 Ga. 461 (360 SE2d 258) (1987); *Childs v. State,* 257 Ga. 243 (357 SE2d 48) (1987); *Romine v. State,* 256 Ga. 521 (350 SE2d 446) (1986); *Cargill v. State,* 255 Ga. 616 (340 SE2d 891) (1986); *Rivers v. State,* 250 Ga. 303 (298 SE2d 1) (1982); *Waters v. State,* 248 Ga. 355 (283 SE2d 238) (1981).

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, due only to the concerns I expressed in my partial dissent to *Wilson v. State*,[2] I dissent to Division 25 of the majority opinion, and to the affirmance of the death penalty only to the extent that it requires death by electrocution.

I am authorized to state that Chief Justice Benham joins me in this partial concurrence and partial dissent.

---

[2] 271 Ga. 811 (525 SE2d 339) (1999).

DECIDED OCTOBER 2, 2000 —
RECONSIDERATION DENIED OCTOBER 26, 2000.

*Garrett & Gilliard, Michael C. Garrett, Kathy S. Palmer, Alice C. Stewart, Michael Mears*, for appellant.

*Richard A. Malone, District Attorney, William S. Askew, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Allison B. Vrolijk, Assistant Attorney General*, for appellee.